THOMAS M. PIERCE, Treasurer of Vandeventer Parks, et al. v. ST. LOUIS UNION TRUST COMPANY et al., Appellants.

Division One, December 22, 1925.

1. **CONVEYANCES:** Restrictions upon Use: Intention: Separate Clauses. The actual intention of the parties governs in the interpretation of restrictive covenants contained in a deed, and that intention or purpose is not to be ascertained by segregating separate clauses from their context, but from a consideration of the instrument as a whole.

2. ————: Restrictions upon Seventy Feet Front: Expressio Unius: Intention. The maxims *ejusdem generis* and *expressio unius exclusio alterius est* are properly applied in the construction of written instruments only in ascertaining the true intention of the parties. Where the deed declared that none of the owners of the eighty-six lots in Vandeventer Place "will erect upon either of said lots within seventy feet of the front of the same any buildings other than first-class dwelling houses," such owners were not, even if such maxims were employed in construing the restriction, permitted to erect more than one dwelling upon a lot, nor to construct any kind of a building or structure on the rear seventy-four feet of a lot and use such rear part for any purpose inconsistent with residential uses. The intention of the parties, as gathered from the whole deed, the situation of the property affected, the present and prospective use and the purpose to be accomplished, must determine the interpretation of the restrictions.

Pierce v. St. Louis Union Trust Co.

3. ———: **Restrictions upon Use: When Enforcible.** Restrictions upon the fee of city lots are not favored in the law; but when the intention of the parties, as evidenced by their solemn covenants, to restrict the use of the property, is clear and unmistakable, such restrictions, if lawful, will be enforced.

4. ———: ———: **Residential Purposes: Use Noxious or Offensive to Neighbors: Hospital.** The owners of a tract of unimproved land at the outer edge of the city laid out the central portion into a private park, in accordance with an elaborate plan for its adornment with shrubbery, trees, fountains and other works of art, including a private driveway on each side and sidewalks, all to be maintained by a method of assessment levied proportionately against the lots abutting on the driveways or places, and divided the part abutting on the places bordering the park into eighty-six lots. The deed conveying the lots, and containing the covenants relating to the uses to which the lots and park were to be put, provided that "the right and privilege to frequent, use and enjoy the before-described park and places shall be an easement attached to each and every of said eighty-six lots, and passing as appurtenant thereto, and to be had, held and enjoyed by the owners from time to time of the said respective lots and their respective families occupying the same;" that the trustees appointed by the instruments shall "permit, suffer and allow the owner or owners, from time to time, of said eighty-six lots, or any of them or any part of them, with their respective proper families or the tenants under them and their respective families (but not exceeding one family for or in respect to each of said lots) to have free ingress and egress to and from said park, and to frequent, use and enjoy the same as a place of common resort and recreation;" that none of the owners of said lots "shall or will at any time hereafter erect any building on said lots within thirty feet of the front boundary line thereof, or will erect upon either of said lots within seventy feet of the front of the same any buildings other than first-class dwelling houses, constructed of wood, brick, stone or iron, to cost and be worth at least ten thousand dollars for the house upon each lot, and shall not erect or permit any building whose principal front is not towards said places, nor erect or permit upon any part of any or either of said lots" certain specified kinds of buildings or uses, "or any trade or business of any kind, dangerous, noxious or offensive to the neighboring inhabitants, or any tenement house, tavern, hotel or public school, or any warehouse or place of trade or merchandise." These covenants were expressed in all the deeds, and run with the title, and stone and brick houses of the cost specified have been erected on eighty-five of the lots, and for many years have been occupied, and all the provisions in reference to maintaining the

parks, driveways and sidewalks have been observed. *Held*, that the deed clearly discloses that the intention of the original owners was to create a high-class, exclusively residential district, the respective houses to be occupied by members of one family only, and therefore the use of one of said houses "for the purpose of carrying on therein the business of running a hospital, or institution for the cure of incurables" violates the restrictions of said conveyance, and is enjoined.

5. **CONVEYANCES: Restrictions upon Use: Residential Purposes: Practical Construction by Parties.** A practical construction placed by the parties for many years upon the meaning of a restrictive covenant contained in deeds will, in the absence of strong proof to the contrary, go far to establish theirs as the construction intended. Although the original owners, in executing many years in the past their instrument placing restrictions upon the use of real estate, may have failed to express their intention with the completeness and precision possible had they known the annoying uses of property which have sprung up in recent years, if their grantees have consistently pursued a course by which it is clear that they understood the instrument to restrict the uses to residential purposes alone, that practical construction is of great aid in arriving at a correct interpretation of the restrictive covenants.

6. ————: **Restricted Use: Residential Purposes: Hospital.** To put a dwelling house in a district reserved solely for residential purposes to use as a hospital for incurables violates a restriction in a deed forbidding the owner of a lot to "erect or permit any trade or business of any kind, dangerous or offensive to the neighboring inhabitants," where the evidence shows that the term "incurables" includes persons suffering from the well known social diseases, as well as locomotor ataxia, cancer, leprosy and other similar diseases.

7. ————: **To Trustees: Continuation of Restrictive Covenants after Death: Perpetuity: Termination by Consent.** Where owners, designing to devote a tract of land solely to residential uses, conveyed the central portion thereof to trustees, in order that they might lay out such portion into a private park, driveways and sidewalks, and improve and beautify the same by imposing charges upon the eighty-six platted lots fronting thereon, and further provided that upon the death of the last surviving trustee the trust should cease and that "from and after that time, all and every of the aforesaid covenants, conditions, restrictions and charges shall be and remain in full force and application to and binding upon all and every part of the aforesaid land and premises, and upon all and every owner and occupant of said land and every part thereof, but strictly and only as covenants, conditions, restrictions and charges (and not as trusts), but running with and appurtenant

Pierce v. St. Louis Union Trust Co.

to the said lands and every part thereof," and the deeds to pur-
chasers of the lots contained the covenants restricting the use of
the lots solely to residential purposes, the restrictive covenants did
not end at the death of the last surviving trustee, nor did they
offend against the rule of law against perpetuities, since they may
at any time be terminated by the unanimous consent of the owners
of the lots.

8. ———: Restrictive Use: Waiver.  A slight transgression of the
restrictive covenants by the owners of four or five lots does not
amount to a waiver, by the owners of all the lots in the restricted
district, of a clear violation of the covenants by the defendant in
the injunction suit.

9. ———: ———: Changed Conditions.  The coming of stores, garages,
manufacturing plants and picture theaters into the neighborhood
of the secluded addition will not authorize a court of equity to ad-
judge no longer operating or binding the restrictive covenants
establishing it as a residential district, where it has successfully for
many years maintained its exclusive character as a single family
residential district of the highest class, and the evidence shows that
substantial benefits will continue to inure to the complainants by
the enforcement of the covenants.

10. ———: ———: Comparative Values.  The controlling question in
determining whether the restrictive covenants should be adjudged
to be no longer operative is whether they are of substantial benefit
or value to the complainant lot owners; and the trial court does not
err in refusing to receive evidence showing the values of the prop-
erty affected with the restrictions removed as compared with the
restrictions retained, where the complainants are content to con-
tinue to use their several properties for single family homes as they
have in the past.  The fact that the properties may have a greater
money value for business than they have for homes is of no im-
portance where they have not become unsuitable for residence pur-
poses.

Corpus Juris-Cyc. References: Deeds, 18 C. J., Section 198, p. 252, n.
30; Section 216, p. 260, n. 38; Section 449, p. 385, n. 95, 98, 99, 2, 3;
Section 450, p. 386, n. 17; p. 387, n. 18; p. 388, n. 27; p. 389, n. 32; Sec-
tion 452, p. 391, n. 49, 60 New; Section 455, p. 393, n. 93; Section 468,
p. 403, n. 17.  Ejusdem Generis, 19 C. J., p. 1255, n. 16.  Expressio Unius,
etc., 25 C. J., p. 220, n. 17.  Incurable, 31 C. J., p. 410, n. 52.  Injunctions,
32 C. J., Section 321, p. 207, n. 91 New; Section 328, p. 212, n. 38; p. 213,
n. 39; Section 332, p. 214, n. 60;  Section 580, p. 349, n. 40; Section 581,
p. 351, n. 81.

Appeal from St. Louis City Circuit Court.—*Hon. Robert
W. Hall*, Judge.

AFFIRMED.

*S. T. G. Smith* for appellants.

(1)   The provisions of the deed from Vandeventer et al. Peck et al., trustees, do not prohibit the use of the property in Vandeventer Place as a hospital.   Bolin v. Tyrol Inv. Co., 273 Mo. 257; Kitchen v. Hawley, 150 Mo. App. 497; Morrison v. Darr, 201 S. W. 1147; Hurley v. Brown, 60 N. Y. Supp. 846; Gallon v. Hussar, 172 App. Div. (N. Y.) 393; Biggs v. Sea Gate Assn., 211 N. Y. 482; Stone v. Pillsbury, 167 Mass. 332; Mayor v. Water Works Co., 152 Ala. 306; Clark v. Jammes, 87 Hun, 215.   (2)   An hospital is not a "trade or business dangerous, noxious or offensive to the neighboring inhabitants."   Paul v. House of St. Giles the Cripple, 154 N. Y. Supp. 96; Heaton v. Parker, 116 N. Y. Supp. 46; Carr v. Riley, 198 Mass. 70; Stone v. Pillsbury, 167 Mass. 332; Doe v. Bird, 6 Carr. & Payne, 195; Commonwealth v. Charity Hospital, 199 Pa. St. 119; Moller v. Presbyterian Hospital, 72 N. Y. Supp. 483; Kitchen v. Hawley, 150 Mo. App. 497; Gallon v. Hussar, 172 App. Div. (N. Y.) 393; Biggs v. Sea Gate Assn., 211 N. Y. 482; Heaton v. Packer, 116 N. Y. 46; Moubray v. Imp. Co., 178 App. Div. (N. Y.) 737; Kitching v. Brown, 180 N. Y. 414; Carr v. Riley, 198 Mass. 70; Easterbrook v. Hebrew Asylum, 85 Conn. 289; Tobey v. Moore, 130 Mass. 448. (3) The provisions of the deed to Vandeventer Place from Vandeventer et al. to Peck et al., trustees, are so indefinite, uncertain and conflicting as to be void on their face.   Bolin v. Tyrol Inv. Co., 273 Mo. 257; Morrison v. Darr, 201 S. W. 1147; Kitchen v. Hawley, 150 Mo. App. 497; Biggs v. Sea Gate Assn., 211 N. Y. 482; Easterbrook v. Orphan Society, 85 Conn. 289; Stone v. Pillsbury, 167 Mass. 332; Fortesque v. Carrol, 76 N. J. Eq. 583; Kurtz v. Potter, 60 N. Y. Supp. 764, 167 N. Y. 586; Hurley v. Brown, 60 N. Y. Supp. 846.   (4). The conditions affecting Vandeventer Place have so changed since the date of the deed from Vandeventer et al. to Peck et al., trustees, as to destroy the provisions attempting to create a high-class, exclusive district, if

such was the original effect of said deed. Koehler v. Rowland, 275 Mo. 573; Trustees Columbia College v. Thacher, 87 N. Y. 311; Hobson v. Cartwright, 93 Ky. 368; Los Angeles Assn. v. Muir, 136 Cal. 36; McClure v. Leaycraft, 183 N. Y. 36; Amerman v. Deane, 132 N. Y. 355; Batchelor v. Hinkle, 210 N. Y. 243; Page v. Murray, 46 N. J. Eq. 325; Orne v. Fridenberg, 143 Pa. St. 487; Jackson v. Stevenson, 156 Mass. 496; Kneip v. Schroeder, 255 Ill. 621; Star Brewery Co. v. Primas, 163 Ill. 652; Fortesque v. Carrol, 76 N. J. Eq. 583. (5) The court should have admitted the evidence offered by the defendants tending to show changed conditions in and about Vandeventer Place. Koehler v. Rowland, 275 Mo. 573. (6) By placing certain restrictions on the front seventy feet of the lots in Vandeventer Place and other conditions on the remaining seventy-four feet of each lot, the attempt to restrict the lots in Vandeventer Place failed. By specifying the character of stuctures and uses of the property in Vandeventer Place, all structures and uses not mentioned in the deed are by operation of law permissible. Bolin v. Tyrol Inv. Co., 273 Mo. 257; Kitchen v. Hawley, 150 Mo. App. 497, and cases cited under 1. (7) Apartment houses, office buildings, hospitals, private schools, boarding houses, churches, homes for the aged and for abandoned infants, and a great many lines of manufacturing can be built in Vandeventer Place without violating the terms of the deed from Vandeventer et al. to the trustees. Morrison v. Darr, 201 S. W. (Mo.) 1147; Bolin v. Tyrol Inv. Co., 273 Mo. 257; Kitchen v. Hawley, 150 Mo. App. 497; Kitching v. Brown, 180 N. Y. 414; Fortesque v. Carroll, 76 N. J. Eq. 583; McClure v. Leaycraft, 183 N. Y. 36; Clark v. Jammes, 87 Hun, 215; Hurly v. Brown, 60 N. Y. Supp. 846; Amerman v. Deane, 132 N. Y. 355; Paul v. House of St. Giles the Cripple, 154 N. Y. Supp. 96; Gallon v. Hussar, 172 App. Div. (N. Y.) 393; Easterbrook v. Orphan Asylum, 85 Conn. 289; Stone v. Pillsbury, 167 Mass. 332; Tobey v. Moore, 130 Mass. 448; Moubray v. Imp. Co.,

178 App. Div. (N. Y.) 737; Carr v. Riley, 198 Mass. 70; Heaton v. Parker, 116 N. Y. Supp. 46; Doe v. Bird, 6 Carr. & Payne, 195; Rowland v. Hospital, 72 N. Y. Supp. 483. (8) Where property is restricted to a high-class exclusive residental district, if the evidence shows that changes in the neighborhood have taken place to the extent defendants offered to prove at the trial of this case, restrictions covering the property are at an end. Koehler v. Rowland, 275 Mo. 573. (9) The court should have permitted the defendants to introduce the evidence offered tending to show the value of property in Vandeventer Place with the restrictions in force and with the restrictions removed. Los Angeles Land Co. v. Muir, 136 Cal. 36; McClure v. Leaycraft, 183 N. Y. 36; Schwartz v. Duhne, 118 App. Div. 105; Star Brewing Co. v. Primas, 163 Ill. 652; Amerman v. Deane, 132 N. Y. 355; Batchelor v. Hinkle, 210 N. Y. 243; Page v. Murray, 46 N. J. Eq. 325; Jackson v. Stevenson, 156 Mass. 496.

*T. M. Pierce* and *Samuel H. Liberman* for respondents.

(1) The use or occupancy of No. 6 Vandeventer place for any purpose other than that of a private residence violates the covenants and restrictions applicable to the premises. Koehler v. Rowland, 275 Mo. 573; Kenwood v. Hancock Inv. Co., 169 Mo. App. 715; Sanders v. Dixon, 114 Mo. App. 229; Morrison v. Hess, 231 S. W. 997; Peters v. Buckner, 232 S. W. 1024; Adams v. Cary, 226 S. W. 833; Milligan v. Balson, 264 S. W. (Mo. App.) 73; Bornett v. Vaughn Institute, 199 N. Y. Supp. 45; Barnett v. Vaughn Institute, 197 N. Y. 541; Smith v. Graham, 147 N. Y. Supp. 773; Cromwell v. American Bible Society, 195 N. Y. Supp. 333; Neidlinger v. New York Assn. for Poor, 200 N. Y. Supp. 852; Paine v. Bergrose Dev. Co., 198 N. Y. Supp. 311; Baumert v. Malkin, 235 N. Y. 115; Powers v. Radding, 225 Mass. 110; Harris v. Roraback, 137 Mich. 292; Rosen-

sweig v. Rose, 201 Mich. 681; Farley v. Finn, 197 N.
W. (Mich.) 571.    (2)   A hospital or institution for in-
curables is a business dangerous, noxious and offensive
to the neighboring inhabitants.  Bramwell v. Yacy, 48
L. J. Ch. 339; Gilford v. Babies Hospital, 1 N. Y. Supp.
448; Rowland v. Miller, 139 N. Y. 93; Evans v. Foss, 194
Mass. 513; Hibberd v. Edwards, 235 Pa. 454.    (3)
Since Vandeventer Place is still a high-class, exclusive,
residential district, equity will enforce the covenants
and restrictions by injunction.  Thompson v. Langan,
172 Mo. App. 64; Rowland v. Miller, 139 N. Y. 93; Lat-
timer v. Livermore, 72 N. Y. 174; Brown v. Huber, 80
Ohio St. 183; 4 Pomeroy, Eq., sec. 1701; Landell v. Ham-
ilton, 175 Pa. 327.    (4)   Evidence of changed conditions
outside Vandeventer Place was properly excluded.  Spahr
v. Cape, 143 Mo. App. 114; Noel v. Hill, 158 Mo. App.
426; Thompson v. Langan, 172 Mo. App. 64.    (5)  Evi-
dence as to camparative values of property in Vande-
venter Place as affected by the restrictions was prop-
erly excluded.  Reed v. Hazard, 187 Mo. App. 547; Miller
v. Klein, 177 Mo. App. 557; Thompson v. Langan, 172
Mo. App. 64; Fete v. Foerstel, 159 Mo. App. 75; Noel
v. Hill, 158 Mo. App. 426; Spahr v. Cape, 143 Mo. App.
114.

SEDDON, C.—Suit in equity to enjoin the alleged
violation of the restrictive covenants contained in a cer-
tain deed or instrument of title affecting Vandeventer
Place, a platted addition or subdivision of land in the
city of St. Louis.  The suit is brought by Thomas M.
Pierce, individually and as treasurer of Vandeventer
Parks, and some 38 owners of residential property in
said addition, as plaintiffs, against St. Louis Union
Trust Company and Peyton T. Carr, trustees under the
will of Almira W. Kehlor, deceased, holders of the legal
title to the real property described as Lots 1, 3, 5 and
7, known as No. 6 Vandeventer Place and John J. Mahon
and Julia Mahon his wife, lessees of said property, as
defendants.

Plaintiffs' petition is in the conventional form, alleging the existence of the restrictive covenants and their applicability to defendants' property, the violation thereof by defendants, that plaintiffs are without adequate remedy at law, and praying injunctive relief.

The answer admits the deed or instrument containing the restrictive covenants alleged in the petition, but denies their applicability to a hospital or institution for incurables, and by way of affirmative defenses pleads waiver and abandonment of the restrictive covenants and change of conditions in Vandeventer Place and the immediately surrounding or contiguous neighborhood, which change of conditions, it is averred, makes the enforcement of the restrictions inequitable. The answer also admits the ownership of the lots aforesaid as being in the defendant trustees and the lease of the premises to the defendants Mahon for use as hospital for the care of incurables; alleges that the defendants Mahon have never had, and do not purpose at any time to have, in said premises any patients afflicted with any disease or ailments which are contagious; that said hospital has been and will always be conducted in a quiet, orderly manner, and that there are no outward signs of any kind by which any person would know to what uses said premises are being put, and that to all outward appearances said premises are being used for residential purposes; that said Mahons use part of said premises for their home and, since August 3, 1921, have continuously resided thereon; that the property in question is no longer suitable or usable as high-grade, exclusive residence property, but can only be profitably used by the owners thereof for such purposes as boarding-houses, hotels, schools, hospitals, orphan asylums, apartment houses, office buildings, and other like purposes and, therefore, said covenants and restrictions, if they ever had any binding force or effect, have long since ceased to be of any binding effect upon any of the property in Vandeventer Place; that, if said property can be put to the only uses to which it is now adaptable, it has a value

greatly in excess of any price at which it can be disposed of for exclusive residence purposes and the property in question will readily sell for six times its sale price for residence purposes only. The reply is a general denial.

Plaintiffs' evidence tends to show that, in 1870, William Vandeventer and the executors of the estate of Peter L. Vandeventer, deceased, were the owners in fee simple of a certain tract of land in the city of St. Louis. In order to improve and dispose of said land to the best advantage, they determined to lay out a certain cross street and dedicate the same to public use forever and also determined to lay out two ornamental parks or places through the central part of said tract and to dedicate such parks or places, with the foot-walks surrounding the same, to the use of the persons who might purchase and improve the lots of ground situated around said parks, but not for more public use; to adopt certain regulations for the government of said parks and to cause all the spaces on each side of said parks to be laid out into lots, numbered from 1 to 86, inclusive, which lots they purposed to dispose of for building purposes, subject to certain regulations and restrictions expressed in the deed or instrument hereinafter referred to. In order to effectuate the objects aforesaid, the then owners, as parties of the first and second parts, executed and filed in the Recorder's office a plat of Vandeventer Place and a deed or instrument, dated June 18, 1870, conveying to Charles H. Peck, Napoleon Mullikin and John S. McCune, trustees, as parties of the third part, the two parks laid out or shown upon the map or plat, the open spaces on each side of and adjoining said parks, designated on the map as North Vandeventer Place and South Vandeventer Place, and also the strips of land designated on said map as and for foot-paths and sidewalks surrounding said parks and places designated on said map, including all the land shown upon said map other than the 86 lots of ground intended for building purposes. The deed was duly recorded on July 1, 1870, in the office of the Re-

corder of Deeds of the City of St. Louis. In substance it provides that the three trustees therein named shall hold the lands conveyed, in trust, to improve the spaces conveyed; to lay out and construct parks, ornamental grounds and walks; to plant and place therein suitable trees and shrubbery, and other appropriate decorations and works of use or art as may be deemed proper; to lay out, construct, grade and pave the open spaces contiguous to such parks; to maintain and keep such improvements in good order and repair and against every encroachment, trespass or nuisance; to pay and discharge all public or local taxes assessed against said lands and, furthermore, "to permit, suffer and allow the owner or owners, from time to time, of the said 86 lots, or any of them or any part of them, with their respective proper families or the tenants under them and their respective families (but not exceeding one family for or in respect to each of the said lots) to have free ingress and egress to and from such parks, or either of them; and to frequent, use and enjoy the same as a place of common resort and recreation, under and subject always to such rules and regulations as the owners of two-thirds in number of all the said lots (as numbered in said map) shall, from time to time, make, establish and prescribe." The deed also authorizes and empowers the trustees to collect and recover annual charges or assessments upon the respective 86 lots, each of said lots to be chargeable with one eighty-sixth share of all sums of money expended from time to time in the upkeep and maintenance of said improvements. The deed contains the following expressed covenants and restrictions:

"Second. That neither the said parties of the first and second parts, nor their or any of their heirs or assigns, owning, or who may at any time own any of said eighty-six lots of ground, shall or will at any time hereafter erect any building on said lots within twenty feet of the front boundary line thereof, or will erect upon either of said lots within seventy feet of the front of the same (such front being deemed to be upon, or to-

wards, said parks), any buildings other than first-class dwelling houses, constructed of wood, brick, stone or iron, to cost and be worth at least ten thousand dollars for the house upon each lot, or in the proportion of fifty per cent more for any greater frontage, and shall not, nor will, erect or permit any building, whose principal front is not towards said Vandeventer Places; nor will erect or permit upon any part of any or either of the said lots, any livery stable, slaughter-house, smith-shop, forge, furnace, steam engine, brass foundry, nail or other iron factory, or any manufactory of gunpowder, glue, varnish, vitriol, ink or turpentine, or for the tanning, dressing or preparing furs, skins, hides or leather, or any brewery, distillery or public museum, or any theatre or circus or place of similar amusement, or place for the exhibition of animals, or any trade or business of any kind, dangerous, noxious or offensive to the neighboring inhabitants; or any tenement house, tavern, hotel or public school, or any warehouse or place of trade or merchandise.

"Third. That the right and privilege to frequent, use and enjoy the before described parks and places shall be an easement attached to each and every of the said eighty-six lots of land, and passing as appurtenant thereto; and to be had, held and enjoyed in manner aforesaid by the owners from time to time of the said respective lots, and their respective families occupying the same, provided they shall make the annual payments before provided for, and observe such regulations as aforesaid, but not otherwise.

"Fourth. That, all and singular, the covenants, conditions and restrictions hereinbefore expressed shall attach to and run with each and every of the said lots of land, and all titles to, and estates in the same and shall be binding upon each and every owner and occupant of the same forever; and that neither the said parties of the first and second parts, or any of them, nor their heirs or assigns, shall or will convey, devise or demise any or either of the said lots or any part of the same at any

311 Mo. Sup.—18.

time hereafter, except as being subject to the said covenants, conditions and restrictions, and the obligation to observe and perform the same; and whether or not it be so expressed.in the deeds or other conveyances of said premises, the same shall be absolutely subject to the said covenants, conditions and restrictions which shall run with and be appurtenant to the said land and every part thereof, as fully as if expressly contained in proper and obligatory covenants or conditions, in each and every contract and conveyance of, or concerning any part of the said land or the improvements to be made thereon.

"And It Is Further Provided, declared and agreed, that, if the parties of the first and second parts, or any of them, or their heirs or assigns, hereafter owning any of the said eighty-six lots or any part of any such lot, shall infringe or attempt to infringe, or omit to perform any of the covenants, conditions or restrictions herein contained relating to such lots or to any other premises herein described, or to the use and improvement of the same, it shall be lawful for any other person or persons owning any other of the said lots or any part thereof, and also of the parties hereto of the third part, or the said trustees for the time being in behalf and for the benefit of either themselves and the other owners of said lots, or for any or either of them, to prosecute any proceedings at law or in equity against the person or persons infringing or attempting to infringe, or omitting to perform such covenant, condition or restriction, and either to prevent him or them from doing so, or to recover damages or other dues for such infringements or omissions. But it is declared and provided that while all such covenants, conditions and restrictions shall be valid and binding upon, and must be observed and kept by every owner and occupant of the said land or any part thereof, for and in respect to so much of the said land as he or they may from time to time own, occupy or control, yet that they are not to be enforced personally against any of the parties hereto or their heirs or assigns, unless he or they while owners or occupying

or controlling one or more of such lots or some part thereof, shall have violated or failed to perform such covenants, conditions and restrictions or some of them.

''And It Is Further Provided, declared and agreed, that whatsoever trusts are hereby created, and whatever power and rights are hereby conferred upon all the said parties of the third part shall vest in and inure to the benefit of, and may be fully exercised by the major part of them and by their successors and by the survivors and major part of the survivors and last survivor of them and their successors. . . .

''And, inasmuch as the rules of law may not permit the trusts aforesaid or the estate, legal or equitable, of the said parties of the third part, as hereby created and vested in them and their successors, to continue and be valid longer than during the lives of the persons herein named as parties of the third part, that is to say, until the decease of the last survivor of those persons,

''It Is Therefore Further Provided (anything hereinbefore contained to the contrary notwithstanding) that immediately upon the decease of the last survivor of them, the said persons herein named as parties of the third part, the trusts aforesaid (as actual trusts) and the legal or equitable estate of the parties of the third part and their successors as trustees of the said property, shall absolutely cease and determine. But that from and ever after that time, all and every of the aforesaid covenants, conditions, restrictions and charges shall be and remain in full force and applicable to and binding upon all and every part of the aforesaid land and premises, and upon all and every owner and occupant of said land and every part thereof, but strictly and only as covenants, conditions, restrictions and charges (and not as trusts), but running with and appurtenant to the said lands and every part thereof. That, thenceforth it shall be lawful for, and power is hereby given to, the owners from time to time and at all times, of the said lots, or for the major part of them, to carry out, continue and perpetuate the general object and interests of

the said trusts and improvements in manner following, to-wit: They, or the owners of a majority of the said lots, shall, by vote or other agreement, adopt such regulations as they may think proper affecting the said lots and the improvements thereon and the said parks and places;

"Provided such regulations shall be consistent with the general object and intent of the previously existing trusts, and shall tend to perpetuate the improvements herein provided for; and to that end may from time to time assess and charge upon each and every or any lot and portion of said property such proportionate sum or amount as may be necessary or proper to be paid by the owner or occupant thereof for preserving, keeping in order and beautifying the said parks and places or any part of the same, which sums so assessed shall be due, owing and payable to and may be collected by such treasurer as shall be duly chosen or appointed for that purpose from time to time by the holders and owners of the major part of said lots, and the obligation to pay such assessments shall be deemed and taken to bind the owners of the respective lots to pay the same to such treasurer personally receiving or suing for and collecting the same in his own name, but with the description of Treasurer of Vandeventer Parks. And, for these purposes, the owners of said lots or the major part of them shall have power from time to time (after cessation of the trusts aforesaid) to choose or appoint such treasurer as aforesaid, and to provide for his proper compensation. And he shall have the powers aforesaid, and shall also have power to use and apply the moneys so collected, in the first place, to satisfy and discharge all lawful taxes and public assessments affecting said parks and places, and in the next place to keep the same in good and substantial order and repair, and to apply any surplus thereof towards beautifying and improving the same in such manner as the said owners of lots or the major part of them, for the time being and from time to time shall authorize and direct."

Upon the death of the last surviving trustee named in said deed, more than a majority of the then owners of the 86 lots in said addition, executed, acknowledged and caused to be recorded an instrument or agreement, dated December 9, 1899, reciting the death of the last surviving trustee on July 3, 1899, naming a treasurer of Vandeventer Parks, making an assessment against each lot for the year 1900, and adopting certain regulations respecting Vandeventer Place. Plaintiffs offered such agreement in evidence and also introduced in evidence the lease covering the property known as No. 6 Vandeventer Place, executed by the defendants herein. Said lease contains the following significant provisions:

"The said Lessees hereby covenant and agree to and with said Lessors, their successors and assigns as follows: . . .

"That they will use said premises for the purpose of carrying on therein and thereon the business of running a hospital, or institution for the cure of incurables; it being understood and agreed that Lessors are desirous that said business shall be carried on in said premises, and for that reason this provision requiring said business or businesses above mentioned is inserted in this lease, and that said Lessees will not use said premises for any other business or purpose, except those covered by the terms hereof. . . .

"It is further agreed by and between the parties hereto that, if for any reason the Lessees shall be evicted from the above-described premises, or by decree of court restrained from carrying on the above-described business or businesses on said premises, during the first six months period of this lease, all rent paid for said premises for said first six-months period shall be refunded to the Lessees, and if said eviction or decree of court shall prevent the Lessees from carrying on the businesses above mentioned in or on said premises within twelve months after the date of this lease, then one-half of the rent paid for said one year's period shall be refunded to the Lessees.

"And whereas, there is a question as to whether or not the businesses hereinbefore mentioned to be carried on by the Lessees in and on the above-described premises will be a violation of the restrictions covering the property hereinbefore described, said parties hereby agree as follows: That if any suit or suits of any kind are brought against the Lessees, or either of them, for the purpose of enjoining or preventing them from carrying on either or both of the above-mentioned businesses in or on said premises, that in that event the Lessees hereby agree that they will permit the said Lessors to defend said suit or suits in the name of said Lessees. Lessors shall, if they so desire, have the right to prosecute any and all appeals from any such judgment or decree in the name of Lessees, but solely at the cost and expense of Lessors.

"It is further agreed by and between the parties hereto that Lessees take this lease with knowledge of all of the restrictions on said property, and that there is a question as to whether or not the premises hereby demised can be used for the purpose of carrying on the business or businesses hereinbefore mentioned and described, and it is mutually agreed between the Lessors and Lessees that if a final decree of court shall be rendered at any time during the term of this lease enjoining the Lessees from carrying on either or both of the above-mentioned businesses, then this lease shall cease and determine.

"It is further agreed between the parties hereto that if said Lessees are enjoined or restrained from carrying on either or both of said businesses hereinbefore mentioned, they, the Lessees, shall have no claim against the Lessors for any damage of any kind by reason of their having been so restrained or enjoined from carrying on said business or businesses, or because of any eviction from said premises."

The evidence shows that Vandeventer Place in St. Louis extends east and west for about three city blocks from Grand Avenue on the east to Vandeventer Avenue

on the west and is bisected by Spring Avenue, or Division Place, a north and south street. The addition is bounded on the north by Bell Avenue and on the south by Enright Avenue. Each of the 86 lots in the addition has an average frontage of 50 feet, a few of the lots having a slightly greater or lesser frontage, and the lots have an average depth of 143¾ feet. Pursuant to the expressed plan of the original owners and platters of the addition, two private parks, containing shrubs, trees and ornamental landscape gardening effects, were laid out and are still maintained through the center of the addition in an east-and-west direction, with ornamental fountains at both ends. Architecturally imposing and beautiful gates or entrance-ways were built and are still maintained at the Grand Avenue and Vandeventer Avenue entrances to the addition, with separate iron gates to the roadways and sidewalks, which, during certain hours of the night and on holidays and Sundays, are left closed to insure privacy to the owners and residents. The roadways are closed to public traffic and are constructed of gravel. The parks, roadways and sidewalks are maintained by the owners of the lots in the addition by a system of yearly assessments levied against the respective lots, sufficient to maintain at all times an adequate force of gardeners, care-takers and private watchmen. The dwelling houses, all built of brick and stone, face respectively north and south upon the central parkways, and the garages, barns and outbuildings abut upon Enright and Bell avenues, respectively, in the rear, which streets serve as entranceways to the rear of the lots, and are used for the delivery of fuel, ice and groceries to the lots. The addition is privately lighted by the property owners. Plaintiff, Thomas M. Pierce, describes the character of the addition as "a high-grade residential property with the exception of two offensive occupants, occupancies which we are now endeavoring to oust." The children and families of the respective owners use the parkways as a place of play and recreation. The residents of the addition include some of the most prom-

inent citizens of St. Louis, widely known and recognized in the civic, professional and social life of that city. Among their number are Thomas M. Pierce, Samuel W. Fordyce, Jr., and Goodman H. King, lawyers; Doctors Wheeler H. Bond, former City Health Commissioner, Harvey G. Mudd and John R. Caulk, physicians and surgeons; the late George E. Kessler, nationally known landscape architect and city planner; William H. Lee, banker; Thomas K. Niedringhaus, manufacturer; John L. Mauran, architect; Henri Chouteau, realtor; H. Clay Pierce, capitalist; and others equally as prominent. All of the plaintiffs, without exception, testified that they, or some member of their families, had purchased their respective properties, relying upon the restrictions and the desirability of the addition as an exclusive and high-grade residential section of St. Louis, and all testified that the use of defendants' property as a hospital for incurables is obnoxious and offensive to them as owners and residents of said addition.

The testimony of Mr. Kessler, with his broad experience and knowledge of city planning and development, perhaps more clearly expresses the viewpoint of the plaintiff owners and residents. He testified: ''As I see it, Vandeventer Place is one of the few high-class residence areas in the United States, an area bounded on all sides by streets, the length east-and-west; the block, one block, about a normal St. Louis block, north-and-south, in width, and the east-and-west streets continuous with other streets both east of Grand Avenue and west of Vandeventer, the central area not articulating with any streets, and therefore not in anybody's way; a property in which the houses, altogether residence property, single and family residence properties, are faced inward to the garden side; the somewhat unusual condition in the United States; and really one of the most comfortable conditions. And it is that, together with the hope and expectation of protection against invasion of any business of any character, that brought us to consider the question of purchasing in that place. It is

the absence of that sort of thing that will drive us out. Its seclusion; it is quiet, and it is quiet, may I say, in spite of all the talk that has been made about noise. It is within easy reach of the business center of the city; private street, privately protected, privately cared for, and in every sense of the word cared for, something that we do not obtain outside of such a private place, and such restrictions are therefore essential to that protection which we demand, which we ask to be permanently maintained.'' With respect to the use of defendants'' property as a hospital, he said: ''It would destroy the property as a place of homes. The beginning of intrusion, whether it is one end or the other is entirely [im]material. The place stands as one property, and not as individual holdings. The beginning of intrusion of that kind means that there is, nowhere is the property secured against similar conditions alongside of our own homes. My objection to the property is, I know from observation and experience in handling similar things, similar properties in several parts of the country, that it would be only a very short time when every other property in the place will be similarly used, therefore destroying the entire property for our use as home places.''

Plaintiff, Thomas M. Pierce, testified that an executive officer of defendant Trust Company had said, in a conversation with plaintiff: ''The St. Louis Union Trust Company, of which I am vice-president, is one of the trustees of the Almira Kehlor estate. We have arranged and negotiated a contract so as to offend, in the most definite and positive way we know how, the restrictions of Vandeventer Place and see whether or not you can enjoin them. Mr. Peyton T. Carr, a co-trustee, called on us, and told me that he had been advised that the restrictions could no longer be enforced and that he wanted to make a lease of the Kehlor property, and to put the lease upon such terms as would be most offensive to the restrictions, so that if the lease could not be enjoined, then no restrictions could be enforced; a private

hospital for incurables, people diseased. If you can't stop that on us, you can't stop anything. Carr has served peremptory notice upon us that unless we agree to execute a lease for a private hospital with them he will move in the probate court, or take court proceedings, to have us removed as trustees." The co-trustee, defendant Carr, however, by his testimony, positively denied that he had made such statement to, or served such notice upon, any officer of the Trust Company, but admitted that he had had several consultations with officers of the Trust Company respecting an effort to break or test the restrictions. However, the lease itself, executed by defendants, clearly indicates by its recitals and conditions that it was made for the very purpose of testing the validity and effect of the restrictions.

Plaintiff Thomas M. Pierce testified that he had seen patients carried or lifted into defendants' premises on at least two occasions and that he had smelled the odors of drugs, iodoform or other disinfectants emanating from the premises. Several plaintiffs testified that the premises were not well kept and presented an unsightly appearance. The testimony of plaintiff physicians was that the term "incurables," as used in the lease, has a well-defined medical meaning and includes such diseases as the commonly known social diseases, also locomotor ataxia, progressive tumors and cancers, leprosy and the like, and such diseases are generally infectious. Plaintiffs testified that they had each expended large sums of money in the improvement and maintenance of their several homes and in the care and upkeep of the parks and roadways on the faith of the restrictive covenants of record. Others testified that they would have expended further sums in improvements were it not for the doubt raised by the acts and contentions of the two offending property owners respecting the validity and applicability of the restrictions.

Defendants offered evidence tending to show that street-car tracks are laid on Grand Avenue, Enright Avenue and Vandeventer Avenue, three of the four

streets surrounding Vandeventer Place, and that said car tracks are used by several car lines and cars are run at frequent intervals thereon; that one of the lots of the addition is unimproved and a large advertising bill board is built thereon facing Enright Avenue; that the house known as No. 86 Vandeventer Place was used by a Dr. Moore from 1894 to 1915, the date of his death, for a residence, but in which he maintained an office where he received and treated patients; that No. 12 Vandeventer Place was used for a year as a place for holding Sunday School and prayer meetings; that a few of the owners rented their garages and stables for the use and storage of automobiles of other residents of the addition; that odors from packing plants located some distance away sometimes invaded the homes in the addition; that some of the homes were unoccupied and could not be rented; that some of the older residents of the addition had sold their homes and moved away; that many of the plaintiffs had acquired their homes in recent years for a comparatively small consideration; that at least one of the houses had been used for a time as a boarding house; that Grand Avenue was generally recognized and known as a business street; and that the neighborhood was generally noisy and undesirable for residence purposes.

The defendant Mrs. Julia Mahon testified that she was a graduate pharmacist and nurse and had previously been superintendent of several hospitals; that she and her husband had been using the premises, No. 6 Vandeventer Place, from October, 1921, to the time of the trial as a hospital for the care of incurable patients; that there were never more than two patients in the house at one time and at the time of trial there was but one; that there never had been any children about the premises; that neither of the patients was able to walk, although one had been occasionally wheeled onto the porches of the house in a chair; that both patients were afflicted with a social disease; that incurable skin diseases are sometimes treated in hospitals for incurables and pa-

tients suffering therefrom are, as a rule, offensive to look at; that defendant, her husband and mother occupy the lower floor of the house as a residence and the patients occupy the second floor; that no structural changes have been made in the house and that it still has the appearance of a residence or dwelling house and no signs of any kind have been placed upon the premises.

Defendants also offered testimony respecting the changed conditions of the surrounding neighborhood; that close by, on streets outside of the addition, some houses and tenements are occupied by negroes; that, within a short distance therefrom, there are several manufacturing plants, storage houses, garages, repair shops, places of amusement, a skating rink with accompanying illuminating sign and a brass band, a gasoline-and-oil station, and a vacant lot on which a religious sect holds noisy meetings; that the street cars make considerable noise and cause dust and dirt to be thrown and blown into Vandeventer Place; that Grand Avenue and other streets surrounding the addition are used by a vast number of motor and other vehicles and that such vehicles are frequently parked along such streets; and that women of ill-repute frequent Grand Avenue, particularly at night. Most of this proffered testimony was excluded by the trial chancellor, whereupon defendants made offers of proof of such facts. The trial court, however, expressed willingness to receive testimony respecting changed conditions within the confines of Vandeventer Place itself, but little, if any, of such proof was offered by defendants.

Defendants also offered proof as to comparative values of the property in Vandeventer Place, with the restrictions in force and with the restrictions removed, which offers of proof were likewise rejected by the trial chancellor.

Judgment or decree *nisi* was in favor of plaintiffs, and the defendants, and each of them, were "perpetually enjoined and restrained from using or permitting to be used the premises known as No. 6 Vandeventer Place,

the land upon which same are situated or any part thereof or the building or buildings thereon, as a hospital or institution for incurables, so long as the restrictions, covenants, charges and conditions now of record are in force and effect; that the defendants, and each of them, be perpetually enjoined and restrained from conducting and maintaining or permitting to be conducted and maintained on said premises the business or trade of boarding, treating or caring for persons afflicted with incurable diseases or any business or trade dangerous, noxious and offensive to the neighboring inhabitants, and from using or permitting to be used the building or buildings on said premises for purposes other than a private dwelling house, and from permitting more than one proper family per lot to have egress and ingress from and to said premises into and from the parks and places in the said Vandeventer Place.''

After unsuccessfully seeking a new trial, defendants duly appealed to this court.

I.  It is contended by appellants that the restrictive covenants contained in the deed from William Vandeventer et al. to Charles H. Peck et al., trustees, do not prohibit the use of the property in Vandeventer Place as a hospital; that a hospital is not a ''trade or business dangerous, noxious or offensive to the neighboring inhabitants;'' and that the covenants of the deed are so indefinite, uncertain and conflicting as to be void on their face.  On the other hand, respondents contend that the use or occupancy of the premises in question for any purpose other than that of a private residence violates the covenants and restrictions of the deed, and a hospital for incurables is a ''business dangerous, noxious and offensive to the neighboring inhabitants'' within the proper construction of the covenants of said deed.

Interpretation.

It is also claimed by appellants that, while the deed prescribes that none of the owners of the 86 lots in

Vandeventer Place "will erect upon either of said lots within seventy feet of the front of the same any buildings other than first-class dwelling houses," the covenants do not restrict any of the lots to but one dwelling house, nor do they limit the number of families which may occupy any house or houses on the front seventy feet of each lot. Furthermore, appellants urge that an owner of any lot may use the rear seventy-four feet thereof in a variety of ways not inconsistent with the covenants of the deed and may erect any kind of building or structure thereon, without in any way violating the covenants of said deed. In so contending, appellants rely upon the maxims "*ejusdem generis*" and "*expressio unius est exclusio alterius.*" While these maxims have their proper place in the construction of written instruments, nevertheless they must give way to reason and common sense. Such maxims are to be properly applied only in ascertaining the true intention of the parties. The first and primary rule in the construction of deeds and contracts is to ascertain, if possible, the true intention of the parties. In 2 Devlin on Law of Real Property and Deeds (3 Ed.) p. 1856, sec. 990, the learned text-writer says: "A deed, like any other contract, may contain stipulations and restrictions of various kinds. Courts in construing them will endeavor to ascertain the intention of the parties, and will give effect to such intention when ascertained."

Again, Berry in his standard work on Restrictions on the Use of Real Property, page 52, sec. 34, quoting from Kitching v. Brown, 180 N. Y. l. c. 427, says: "The primary rule for the interpretation of restrictive covenants is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement, but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met." [Clark v. Devoe, 124 N. Y. 120; Jamison v. McCredy, 5 Watts and S. (Pa.) 129;

Easterbrook v. Orphan Society, 85 Conn. l. c. 295; Jones' Law of Real Property, sec. 735.]

In Easterbrook v. Orphan Society, 85 Conn. l. c. 302, one of the judges of that court, in discussing the several well-known rules of construction, aptly remarked: "These rules were adopted to aid in carrying out the intention of the parties; they cannot be invoked to defeat it."

Such has been the uniform holding of our own appellate courts. In Kenwood Land Co. v. Hancock Inv. Co., 169 Mo. App. l. c. 722, the court said: "When covenants in the nature of restrictions on the fee are reasonable and within the policy of the law, they are valid. [6 Am. & Eng. Ency. Law (2 Ed.) 513.] When clearly expressed, covenants of this description will be strictly enforced and a court of equity will decree an injunction. [Lloyd on Building, sec. 149, page 288.] Although restrictions on the fee are not favored, yet when the intention of the parties is clear, courts will enforce them. [Hutchinson v. Ulrich, 145 Ill. 336; Kitchen v. Hawley, 150 Mo. App. 497.] The intention of the parties must be determined from the language of the covenant itself considered in connection with the surrounding circumstances at the time the covenant was made (Ibid.); or, as it is sometimes said, from the language of the covenant itself considered in the light of the entire context of the instrument containing it. [Kitchen v. Hawley, 150 Mo. App. 497.] Such covenants must be considered with reference to the situation of the property affected and its present and prospective use as well as to the language employed in expressing the covenant. [St. Louis Deposit Bank v. Kennet, 101 Mo. App. l. c. 388.]"

In Koehler v. Rowland, 275 Mo. l. c. 583, this court said: "Doubtless the intention in inserting the restriction in plaintiffs' deed was to prevent negroes from coming on the premises as tenants. It must be considered with that in view. The narrow and technical construction suggested by respondents, as against such manifest intention, would not accord with the decisions of this

court in considering and passing upon the spirit and purpose of instruments of this character. [Sims v. Brown, 252 Mo. 58; Garrett v. Wiltse, 252 Mo. l. c. 707; Mott v. Morris, 249 Mo. 137.] If the grantors fail to express their contract with completeness and precision, but the intention, nevertheless, clearly appears from the instrument; if its spirit and purpose are manifest from a consideration of the instrument as a whole, it will be given an interpretation in accordance with such intention.''

Again, in Sanders v. Dixon, 114 Mo. App. l. c. 253, the St. Louis Court of Appeals said: ''But all courts profess to give effect to the plain intention of the parties in imposing such restrictions, and should live up to their profession in good faith, instead of seeking ingenious subtleties of interpretation by which to evade restrictions. We shall endeavor to deal fairly with the covenants before us, interpreting them by the words employed, read in the light of the facts existing when the restrictions were imposed, and the objects to be attained.''

Having in mind the foregoing cardinal and primary rule of construction, let us proceed to examine the four corners of the deed in question that we may gather, if possible, the intention of the parties respecting the uses to which the several lots in Vandeventer Place may be put. The deed, in furtherance of the plan of the original owners, provides for the laying out of the central portion of the tract into two private parks, with an elaborate scheme of adornment with shrubbery, trees, fountains and other works of art, including private driveways and sidewalks, all to be maintained by a method of assessment levied proportionately against the 86 platted lots of the addition. It is provided ''that the right and privilege to frequent, use and enjoy the before-described parks and places shall be an easement attached to each and every of the said eighty-six lots of land, and passing as appurtenant thereto; and to be had, held and enjoyed in manner aforesaid by the *owners* from time to time of the said respective lots, and *their respective*

*families* occupying the same;'' furthermore, it is pro-
vided that the trustees shall ''permit, suffer and allow
the *owner or owners,* from time to time, of the said
eighty-six lots, or any of them or any part of them, *with
their respective proper families* or the tenants under
them and their respective families *(but not exceeding
one family for or in respect to each of the said lots)* to
have free ingress and egress to and from such parks,
or either of them, and to frequent, use and enjoy the
same as a place of common resort and recreation.'' The
deed then prescribes that none of the owners at any
time of said eighty-six lots of ground ''shall or will at
any time hereafter erect any building on said lots with-
in twenty feet of the front boundary line thereof, or will
erect upon either of said lots within seventy feet of the
front of the same (such front being deemed to be upon, or
towards, said parks) *any buildings other than first-class
dwelling houses,* constructed of wood, brick, stone or
iron, to cost and be worth at least ten thousand dollars
for *the house* upon *each* lot, or in the proportion of fifty
per cent more for any greater frontage, and shall not,
nor will, erect or permit *any* building, whose principal
front is not towards said Vandeventer Places; nor will
erect or permit *upon any part of any or either of the said
lots''* certain specified kinds of buildings or uses, ending
with the following clauses: ''or *any* trade or *business* of
*any kind,* dangerous, noxious or offensive to the neigh-
boring inhabitants; or any tenement house, tavern, hotel
or public school, or any warehouse or place of trade or
merchandise.'' (Italics are ours).

An examination of the deed in its entirety, in our
opinion, clearly discloses the intention on the part of the
original owners of the tract of land in question to create
therefrom a high-class, exclusively residential district,
the respective homes in which are to be occupied by mem-
bers of one single family. This clear and evident inten-
tion is made doubly certain by the elaborate and com-
prehensive plan of the original owners for the creation
of parks, sidewalks, roadways, ornamentation, foun-

tains and forestry, all limited to the use of *one proper family per lot;* by the method of assessment prescribed for their maintenance; by the positive inhibition against the erection of any building other than first-class dwelling houses (in common parlance, when not otherwise qualified, conveying the idea or notion of a home; Sanders v. Dixon, 114 Mo. App. l. c. 247) to cost not less than $10,000 *for the house upon each lot;* by the prohibition against the erection or permission thereon not only of certain specified trades or businesses, but also of "*any* trade or business *of any kind,* dangerous, noxious or offensive to the neighboring inhabitants."

In construing the restrictive covenants of the deed, we must bear in mind that the plan of development of the original owners was conceived and the deed executed in 1870, long before the modern apartment house, the (so-called) family hotel, the public garage, the moving-picture theatre, the automobile repair and service station, and the oil-and-gasoline filling-station had come into use or existence. With rare and commendable foresight and perspicacity, the original owners, in order to prevent any miscarriage of their plan of exclusive home development, guarded not only against the then certain well-known and recognized annoyances and inconveniences incompatible with the home and family life, but, looking to the far distant future when new and unknown inconveniences and annoyances, alike incompatible with the family and home life, would likely spring into use and existence, also wisely provided against *any* trade or *business* of *any kind,* dangerous, noxious or offensive to the future owners of the respective lots in the platted addition.

As is well said in Easterbrook v. Orphan Society, 85 Conn. l. c. 302, "another rule of universal applicability and primary importance is that, where the parties have for many years placed a practical construction upon the meaning of a restrictive covenant, open to two constructions, this will, in the absence of strong proof of a contrary intention, go far to establish this as the con-

struction intended by the parties." While the original owners may have failed to express their intention with the completeness and precision possible had they known the exact nature of the annoying uses of property which have sprung up in more recent years, nevertheless the property owners of Vandeventer Place, down to the very time of the institution of the suit at bar, have, by their own conduct and use of their respective properties for single family homes, put their own practical construction upon the meaning of the restrictive covenants as used in the deed under which they hold title. In the absence (as here) of strong and convincing proof of a contrary intention upon the part of the original owners, we must accept as applicable the practical construction given to the covenants by the present owners themselves. Upon the death of the last surviving trustee named in the deed, the owners of much more than a bare majority of the 86 lots in the addition met and elected a treasurer and executed, acknowledged and caused to be recorded an instrument evidencing their intention to carry on the plan of the original owners and platters of the addition and adopted regulations affecting the properties consistent with the original plan of use and development. Gathering the intention of the parties from the deed itself in its entirety, together with a proper consideration of the surrounding circumstances and the practical construction placed upon the restrictive covenants by the property owners themselves, we arrive at the conclusion that the whole manifests the clear intention of the parties to make of Vandeventer Place a high-class, exclusively residental district and to limit the use of each dwelling house or home on each lot to one single family. We see nothing indefinite, uncertain or conflicting in the restrictive covenants to render them void or inapplicable.

II.   Is a hospital for incurables a "trade or business dangerous, noxious and offensive to the neighboring

Hospital.
inhabitants'' within the inhibitions of the restrictive covenants of the Vandeventer Place deed? We so conclude.

In Bramwell v. Lacey, 48 L. J. Ch. 339, a lease contained a covenant on the part of the lessee not to carry on upon the demised premises ''any trade, business or dealing whatsoever, or anything of the nature thereof, or be party to or suffer any act or thing which may be or grow to the annoyance, damage, injury, prejudice or inconvenience of the neighboring premises.'' Said LORD JESSEL, M. R.: ''The plaintiffs accordingly say that converting this house into a hospital, and receiving patients there, is a breach of the covenant. The first question is, is this a 'business' or 'in the nature of a business?' I have no doubt it is. It is in reality an apothecary's business. . . . In the next place, is it or is it not an 'act or thing which may be or grow to the annoyance, damage, injury, prejudice or inconvenience of the neighboring premises?' The terms of the covenant are very comprehensive; they are the largest known to the law. . . . The evidence appears to me to be sufficient to show that the persons in the neighborhood have already suffered annoyance, inconvenience and injury, and that the possible danger from infection is a matter of which they have the right to complain. Upon these grounds, I am of opinion that the defendants have committed a breach of the covenant, and the plaintiffs are therefore entitled to an injunction with costs.''

In Gilford v. Babies' Hospital, 1 N. Y. Supp. 1. c. 449, the restrictive covenants were almost identical with those here under review. Said the court: ''This is an express agreement the defendant must perform. If it is not sufficiently broad in its terms to protect adjacent owners, then nothing short of omniscient designation will do so. The effect should not be dimished by legal refinement or argumentative clipping, but its terms should meet with a just yet not a broadening interpretation. . . . The court has invariably enforced such covenants, save when the character of the contiguous

property has wholly changed in use from the original design. I am unable to read this one without a first thought of its preventive application. Neither does the rule of *noscitur a sociis* lessen its legal force. The hospital, even if not dangerous, is injurious and offensive, in the same way as a tenement house, livery or other stable, butcher-shop, or brewery. The rule calls only for similitude in the nature of the injury or offense, not the particular manner or means of its conveyance. The tenement may bring crowd, turbulence, and contagion; so may the hospital. The others may give offense to the senses; so may this business as well."

Of similar effect and purport are Rowland v. Miller, 139 N. Y. 93; Evans v. Foss, 194 Mass. 513; and Hibberd v. Edwards, 235 Pa. 454.

The evidence tends to show that the term "incurables" includes persons suffering from the well-known social diseases, also locomotor ataxia, cancer, leprosy, and other similar diseases. The two patients harbored in the defendants' hospital are victims of social diseases. While such patients are to be pitied and human kindness demands that they be properly cared for and ministered to, nevertheless, the fact remains that they are, in every sense of that term, social outcasts. No self-respecting parent or head of a family would desire to have his children, or even the adult members of his family, live within sight or hearing of such a hospital. Aside from the ever-present possible danger of infection, the mere presence of such an institution in their midst is abhorrent to the sensibilities of a home-and-family-loving neighborhood or community. The use of the premises in question is a clear and positive violation of the restrictive covenants of the deed under which defendants hold title and possession. Nor does the fact that the structural design of the premises has not been changed from that of a dwelling-house, nor the further fact that defendants Mahon use a portion of the premises as a place of residence, render the use of the premises any less a violation of the restrictions. [Barnett v. Vaughan Institute,

119 N. Y. Supp. 45; Neidlinger v. Association, 200 N. Y. Supp. 852; Baumert v. Malkin, 235 N. Y. 115.]

III.  Appellants urge that the restrictive covenants of the deed expired on July 3, 1899, the date of the death of the last surviving trustee named in said deed. We do not so read the deed, for it clearly provides

**Termination of Trust: Continuance of Covenants: Perpetuities.** "that from and ever after that time, all and every of the aforesaid covenants, conditions, restrictions and charges shall be and remain in full force and applicable to and binding upon all and every part of the aforesaid land and premises, and upon all and every owner and occupant of said land and every part thereof, but strictly and only as covenants, conditions, restrictions and charges (and not as trusts), but running with and appurtenant to the said lands and every part thereof." Futhermore, the deed contains the covenant that the original owners, the Vandeventers, will convey each and every of the 86 platted lots subject to said covenants, conditions and restrictions, and the obligation to observe and perform the same, and "that, all and singular, the covenants, conditions and restrictions hereinbefore expressed shall attach to and run with each and every of the said lots of land, and all titles to, and estates in the same, and shall be binding upon each and every owner and occupant of the same forever."

Such restrictive covenants do not offend the rule against perpetuities, since the covenants may at any time be terminated by the unanimous consent of the parties in interest; they are present interests and are no more subject to the rule against perpetuities than are common-law easements. [Gray on Rule Against Perpetuities (3 Ed.) 265, sec. 280; Noel v. Hill, 158 Mo. App. l. c. 443; Koehler v. Rowland, 275 Mo. l. c. 586.]

IV.  It is urged that there has been a waiver of the covenants upon the part of the resident lot owners because, forsooth, a few of the resident owners had

rented the out-buildings in the rear of their premises to other residents of the addition for use as private garages;

Waiver.  because the evidence tends to show that, in one of these out-buildings, a non-resident of the addition has kept a livery automobile, although apparently seeking his patrons from outside the district; that some years ago a physician resided with his family in one of the homes and, like the good old "family doctor" of years now almost forgotten and gone by, maintained an office in his home, where he ministered to his patients and denoted his professional presence in the neighborhood by a simple sign on the house or office door, bearing his name; and that an advertising sign or bill-board has been erected facing Enright Avenue, on one of the vacant lots of the addition, which sign, however, serves a useful purpose in keeping intruders, and dogs and other small animals as well, without the district. We cannot seriously regard these facts as indicative or proof of waiver or abandonment of the restrictive covenants on the part of plaintiffs.

V.  Finally, it is urged by appellants that conditions affecting Vandeventer Place have so .changed since the execution and recording of the deed establishing the restrictive covenants as to utterly destroy the purpose of such restrictions and to make it inequitable

Changed
Conditions.  to longer enforce them by granting injunctive relief. On this point, appellants assign error in the action of the trial chancellor in refusing evidence offered by defendants tending to show changed conditions of the neighborhood in and about Vandeventer Place and in refusing evidence tending to show the comparative values of property in Vandeventer Place, with the restrictions in force and with the restrictions removed. While such evidence was refused *nisi*, defendants made due offers of proof, so that we have the benefit on appeal of the substance of such offered evidence.

It is true that such evidence tends to show, to some extent, changed conditions surrounding Vandeventer

Place. Commercial business, always eager to extend its battle lines into residential districts and throw open its marts to family trade, has drawn near to this secluded addition. Theatres, moving-picture houses, a roller-skating rink and other similar places of amusement and recreation have sprung up close by. Transportation facilities, as is usual and customary, have been extended in order to reach residential sections of the city. The oil-and-gasoline filling-station, ever eager to reach and render convenience to the family of sufficient means to possess an automobile and to purchase the fuel to operate it, has established itself on an available and strategic site. A manufacturing plant and a dry-goods storage warehouse are not far distant. But notwithstanding the assaults of commercial business upon the surrounding neighborhood, the evidence as a whole rather tends to show that Vendeventer Place itself has successfully withstood the advance of the commercial army and has so far maintained its exclusive character as a single family residential district of the highest class. Many families have lived in the addition for more than a generation and many of the homes have passed into the hands of the second generation. Almost without exception, the plaintiff residents and owners of the 86 lots in the addition testified at the trial that the quiet and seclusive character of the district has been maintained and bids fair to continue to exist for some time yet to come. While those of us familiar with the life of the metropolitan city know that street cars do not run noiselessly and their operation is necessarily accompanied by some dust, yet, after all, these little inconveniences are common to all the inhabitants of a great and growing city. The odors from meat-packing plants, offensive as they sometimes are, are certain to be wafted by the prevailing winds, and no home, or place of business, either, however far distant from the plants themselves, is immune from their permeating presence; that also is a nuisance, if such it may properly be called, common to all who choose to live in a large city, whether in Vandeventer Place or elsewhere.

Diligent counsel for appellants has directed our attention to numerous decisions, mostly of foreign jurisdictions, which are claimed to support appellants' contention on this point. It is sufficient for us to say that we have carefully read them all and find them inapplicable to the facts and circumstances before us in the case at bar. Practically all of those decisions are bottomed upon the rule announced in Trustees of Columbia College v. Thacher, 87 N. Y. 311. We find that case clearly distinguishable. There, an elevated railway had been constructed upon the street in front of defendant's property, with a large loading platform or station extending out over the sidewalk in close proximity to defendant's building and a flight of steps leading thereto. The proximity of the platform to defendant's building rendered ocular inspection of the interior of the house easy to all inquisitive observers, for but to look was to see. The court quite properly found that such conditions obviously destroyed the privacy and quietude of the premises and rendered them unsuitable for residential use—clearly, a situation wholly different from that existing in the instant case. All of the cases cited by appellants were decided upon the principal that, because of the changed conditions directly affecting the premises, the enforcement of the restrictive covenants would impose great and unreasonable hardship upon defendant without causing any real or substantial benefit to the plaintiff. The estabished rule is otherwise where substantial benefit inures to the complainant by reason of the enforcement of the restrictive covenants.

In Rowland v. Miller, 139 N. Y. 1. c. 103, the Court of Appeals of that state, distinguishing the case at hand from that of Columbia College v. Thacher, supra, remarked: ''The principles of that case are not applicable to the facts of this. There it appeared that the contract which the plaintiff sought to enforce was no longer of any value to it, and that its enforcement would result in great damage to the defendant, without any benefit to anyone. Here the plaintiff has the right to occupy her

house as a residence, and in such occupation to have the protection of the restriction agreement. She has never violated the agreement herself, or consented to or authorized or encouraged its violation by others."

In Landell v. Hamilton, 175 Pa. St. l. c. 336, it is said: "As long as such restrictions are not unlawful, it is to no purpose to argue that they seriously retard the improvement of the city. We can no more strike down by decree a lawful restriction creating an easement, then we can compel the lot owner to erect buildings in accord with the best style of architecture. . . . We concede, some of the cases decided in other states are in apparent conflict with our decision. But what this court has uniformly held, and now holds, is, that where the restriction, notwithstanding the change of use of the land and buildings, still is of substantial value to the dominant lot, equity will restrain its violation, if relief, as here, is promptly sought." Of similar effect are Lattimer v. Livermore, 72 N. Y. 174, and Brown v. Huber, 80 Ohio St. 183.

The rule just stated seems to have been uniformly followed and applied by our own appellate courts. In Spahr v. Cape, 143 Mo. App. l. c. 129, the St. Louis Court of Appeals said: "All that the evidence tends to show is that the property adjoining this loop, as do the lots here involved, is more valuable for business than for residence purposes. It does not convince us that it has become unsuitable for residence purposes, and so does not come within the three cases cited. The mere fact that it is more valuable or suitable for the one purpose than the other is not enough to justify a court in overturning and nullifying the solemn covenants in the deeds." Those interested may find the principles relating to restrictive covenants further discussed and applied in Noel v. Hill, 158 Mo. App. 426; Thompson v. Langan, 172 Mo. App. 64; Reed v. Hazard, 187 Mo. App. 547; Miller v. Klein, 177 Mo. App. 557; and Fete v. Foerstel, 159 Mo. App. 75.

Nor do we find that the trial chancellor erred in refusing in evidence the comparative values affecting the property in question, with and without the restrictions removed. The controlling question, as we have just stated, is whether the restrictive covenants are of any substantial benefit or value to the plaintiff lot owners.

**Comparative Values.** The trial court found that they are and we have not arrived at a different finding. Plaintiffs are apparently content to continue to use their several properties for single family homes, as they have done in the past. They have not been tempted or lured into converting them to any other use, despite the demands of commercialism and the afforded opportunities of gain and profit. Apparently they regard their several properties in the light and viewpoint of the wandering and homeless poet who has so truly said, ''Be it ever so humble, there is no place like home.'' We cannot better express our own views upon the point before us than by quoting with approval from Noel v. Hill, 158 Mo. App. l. c. 450, whereat it is said: ''Counsel argue with great strenuousness that these restrictions are hurtful to business and restrict the business area, one or more of his witnesses going so far as to say that Vandeventer Place in the City of St. Louis, for instance, would be much more valuable for business purposes than for private residences. That may be, but it is a kind of utilitarianism with which we have no concern. . . . The money or commercial value of a thing is not always a test of its worth. There are some things in the life of a city and of men that are not to be measured by mere money. The man who looks at Niagara Falls, or the Yellowstone, or Yosemite Park, with the mere idea of measuring the value of the one by its water power and of the others by the number of feet, board measure, in the grand trees there found, has lost a good deal out of life. It is to the glory of St. Louis that she is preeminently not only a city of homes, but 'a city of homes beautiful.' No factor has so much contributed to this, not only in reputation but as a fact, as has the

great number of restricted blocks, restricted residence districts. They are scattered all over this great city. This court, as well as our Supreme Court, has at all times recognized that while these restrictions may be, to some extent, a restraint on the use of private property, they are, considered in their larger aspect, of great benefit to the community at large, and, instead of looking at them with a jealous eye and attempting to pick flaws in the covenants creating them and to construe them out of the deeds, have always held that they are to be preserved and observed and sustained as long as that can be done without violation of the rights of contract and unduly restraining the right of alienation and without dispossessing any man of that which by deed and contract he is entitled to hold.''

We have endeavored to glean the facts and surrounding circumstances applicable to the restricted addition in question as brought to us by a lengthy and voluminous record, and to apply those facts and circumstances to the established principles of law governing the enforcement of restrictive covenants as we have read them from the many cases cited by respective counsel. In so doing, we have accorded due deference to the findings of the learned trial chancellor, who has long been a resident of the city of St. Louis and has means of knowledge and information respecting conditions surrounding the restricted addition necessarily denied to us. Our findings and conclusions upon the whole record do not differ from those of the learned chancellor below, and, no reversible error being disclosed by the record, the decree and judgment *nisi* is accordingly affirmed. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Woodson, J.,* absent.