George Ph. EICHELSBACH, F. A. Cammann, and Earle J. Kennedy, Trustees of "St. Louis Hills Estates No. 2, by Cyrus Crane Willmore" Subdivision (Plaintiffs), Respondents,

v.

Charles E. HARDING and Edna J. Harding, His Wife (Defendants), Appellants.

No. 29869.

St. Louis Court of Appeals.

Missouri.

Feb. 4, 1958.

Rehearing Denied March 1, 1958.

682

Tralles, Hoffmeister & Gilpin and Fred J. Hoffmeister, St. Louis, for appellants.

Roberts P. Elam, St. Louis, for respondents.

MATTHES, Acting Presiding Judge.

Action for injunctive relief.

Defendants have appealed from the decree; (1), permanently enjoining and restraining them from maintaining a fence along the sides and rear line of their lot; (2), mandatorily ordering them to remove said fence; (3), permanently enjoining them from erecting any fence along the sides or rear line of their property without the written approval of the trustees of the subdivision in which their property is located.

The controversy arose over the alleged violation of a restrictive covenant prohibiting the erection of fences along the sides and rear line of any lot in the subdivision. By stipulation of the parties, it appears that a tract of land in the Southwest part of St. Louis was subdivided into 160 lots, platted and designated as "St. Louis Hills Estates No. 2 by Cyrus Crane Willmore." The plat was duly recorded in the Recorder's Office in St. Louis, Missouri. In order that the subdivision might always be desirable for, and used as a residential area exclusively, the subdivider entered into an indenture agreement with the three original trustees establishing certain restrictions, covenants, reservations and conditions for the subdivision. The indenture provided for election of successor trustees, and empowered the trustees on behalf of, and for the benefit of, the owners of lots in the subdivision, to prosecute any proceeding against persons violating the restrictions, etc.

Among the general restrictions with which all lots are burdened is the following:

"No fence (except such ornamental fences as may be approved in writing by the Trustees) shall be erected along the sides or rear line of any lot;"

The indenture also provides that "each of the covenants and restrictions * * * shall attach to and run with each of the lots embraced within such covenants, * * * and shall be binding upon every owner or occupant of such lots as fully as if expressly contained in proper and obligatory covenants or conditions in each contract or conveyance of or concerning any lot * * *."

Defendants acquired Lot 41 of City Block 6330 in the subdivision on October 7, 1953, by deed which, by reference, contains the same restrictions, covenants, conditions and reservations incorporated in the indenture agreement. So much for the pertinent stipulated facts.

The evidence discloses that in October, 1954, the defendants commenced construction of a dwelling house on their lot. They caused plans thereof to be prepared by an architect, and before actual construction was under way, the plans were submitted to the trustees for their approval. The plans did not disclose that a fence was to be erected on the premises. On or about June 15, 1955, at a time when defendants' house was about completed, they erected metal posts about 1½ inches in diameter, set in concrete, extending about 4 feet above the surface of the ground along the side and rear line of their lot. Trustees Eichelsbach and Cammann saw the posts on the day they were erected, and on the same evening Eichelsbach received calls from persons living in the immediate vicinity, complaining about the erection of a fence in violation of the restrictions. The trustees, in a meeting held the same evening, decided to employ a lawyer in connection with the matter, and within a day or two John C. (now Judge) Casey was retained. By the latter's testimony it appears that on June 17, he not only advised defendant Chas. E. Harding that there was a restriction against fences, but "tried to talk him into removing the fence." Harding's response was he "intended to continue to erect the fence." Thereafter Judge Casey began the preparation of the petition for injunction, and in connection therewith made the necessary legal research, and investigated title records. The petition prayed for a temporary restraining order making it necessary to obtain a bond. On the morning of June 22, Judge Casey observed the fence posts on defendants' property, but at that time there was no wire attached to the posts. On the same day the petition for injunction was filed, and as a result of the delay in procuring and filing the bond, obtaining issuance of an order to show cause, and certified copies of the restraining order issued by the court, it was nearly five o'clock in the evening before the restraining order was ready for service. Shortly thereafter, service was obtained on defendants, and it was not until after that event that Judge Casey learned that during the day of June 22, the "cyclone" or "chain-link" wire had been attached to the posts and the fence completed.

In addition to the foregoing facts concerning which there was little dispute, the uncontroverted testimony established that a "cyclone" or "chain-link" fence is not an "ornamental," but is strictly a "utilitarian" fence, and that defendants never made application for or received written permission or approval of the trustees to erect the fence.

We do find a conflict relating to a conversation between Trustee Eichelsbach and Mr. Harding which took place on or about April 21, 1955, and a conversation between Trustee Earle J. Kennedy and Harding which occurred the day after construction of fence was begun. Eichelsbach stated that in his conversation with Mr. Harding the latter said, in substance: "I'm goin' to build a fence on this property and you're not goin' to stop me; you can't stop me." To this Eichelsbach replied: "I can't stop you, but there's restrictions." Harding's version of this conversation was: "I told Mr. Eichelsbach that I was going to put up a fence. He said, 'that's perfectly all right; go ahead.'" Regarding the other conversation, it appears that Mr. Kennedy (not at that time a trustee), who had been a friend

of Harding for thirty or thirty-five years, called him by telephone and "I asked Mr. Harding not to put the fence up because it was causing—it was going to cause a lot of commotion in the neighborhood, and I said 'After all, you're goin' to have to live with these people from now on; let's live neighborly, peacefully.'" In response, Harding "told me he was going to complete it." According to Harding, after Kennedy called about the fence he (Kennedy) said, "Well, I live way down the other end of the block, it's not going to bother me either way." But Harding admitted that in the same conversation Kennedy did say "If I were you, I wouldn't put up a fence."

There was evidence relating to the existence of other fences in the subdivision which will have our attention in disposing of the point raised in connection therewith.

Seeking to set aside the decree of the trial court, defendants advance four contentions. The substance of the first two, which are closely allied, is that the mandatory injunction should not have been awarded because this is not a clear case reasonably free from doubt, and necessary to prevent great and irreparable injury; and since the fence had been completed before the restraining order was served, the preliminary restraining order should have been dissolved, because injunction will not issue to restrain that which has been accomplished. We shall consider and dispose of these together, but in inverse order.

■ Inasmuch as the purpose of an injunction is not to provide a remedy for what is past, but to prevent future wrongdoing, and since it is not used to compel persons to do right, but to prevent them from doing wrong, rights already lost, and wrongs already perpetrated cannot be corrected by injunction. Lademan v. Lamb Const. Co., Mo.App., 297 S.W. 184; Corken v. Workman, 231 Mo.App. 121, 98 S.W.2d 153; Fugel v. Becker, Mo.Sup., 2 S.W.2d 743; Hurtgen v. Gasche, Mo.App., 227 S.W.2d 494; Hribernik v. Reorganized School District R–3, Mo.App., 276 S.W.2d

596; 43 C.J.S. Injunctions § 22 c. However salutary this rule may be, it does not necessarily follow that it *must* be applied and the injunction ultimately denied in every case where the wrongful act sought to be prevented has already been consummated. In a case where the defendant ceased commission of the act complained of and nothing indicated an intention to repeat the injury, as was the situation in Lademan v. Lamb Const. Co., supra; or where the sale of real estate sought to be restrained had been consummated prior to trial and cause had become moot, Corken v. Workman, supra; or where right to permanently enjoin secretary of state from making contracts with newspapers for publication of initiative and referendum proposals to be submitted at 1926 election, had become a moot question before final judgment, Fugel v. Becker, supra; or where the main purpose of suit is to restrain officials from collecting taxes and performance had been accomplished prior to final determination of cause, Hurtgen v. Gasche, supra; Hribernik v. Reorganized School District R–3, supra, the court, of necessity, applied the foregoing principle.

■ But the facts herein are quite different from the cases, including the foregoing, which demanded application of the rule contended for. Here, not only did the petition upon which the cause was tried, call for action restraining defendants from "maintaining, * * * or continue to * * * maintain a fence," and for an order mandatorily requiring defendants to remove the fence, but that was the issue that was litigated and tried. By commanding authority, it is now firmly established that a court is vested with power and authority, through its mandatory injunction to compel the undoing of a thing already done in violation of restrictive agreements affecting real estate. Compton Hill Imp. Co. v. Strauch, 162 Mo.App. 76, 86, 141 S.W. 1159; Porter v. Johnson, 232 Mo.App. 1150, 115 S.W.2d 529; Swain v. Maxwell, 355 Mo. 448, 196 S.W.2d 780, loc. cit. 785 where the

Supreme Court stated: "Enforcement of valid and proper restrictive covenants affecting real property is one of the well-established functions of equity. Equitable principles govern their enforcement. A threatened violation may be restrained by injunction. If the forbidden act has been done a mandatory injunction may be issued to undo it." See 14 Am.Jur. Covenants, etc. § 353; 2 High on Injunctions (4 Ed.) § 1158 and cf. Britton v. School Dist. of University City, 328 Mo. 1185, 44 S.W.2d 33 and State ex rel. Britton v Mulloy, 332 Mo. 1107, 61 S.W.2d 741.

■ From the foregoing it conclusively appears that the court was clothed with power and authority to afford relief through its mandatory injunction. Being mindful of the admonition that the "remedy of injunction, frequently characterized as 'the strong arm of equity,' is a summary, transcendent and extraordinary remedy" which "may not be invoked as a matter of course, and should be exercised sparingly and only in clear cases," Barnhart v. Ripka, Mo.App., 297 S.W.2d 787, loc. cit. 792 and cases there cited, and that courts are perhaps even more reluctant to interpose the mandatory writ, 28 Am.Jur., Injunctions, § 20, we are nevertheless fully convinced that the factual situation furnished solid basis for the court to render its decree mandatorily requiring removal of the fence.

■■ Defendants also urge us to hold that plaintiffs are estopped from enforcing the restriction against fences because they have acquiesced in violations of the same restriction by at least twenty-nine owners of other lots in the subdivision. The meat of this contention is that plaintiffs have waived and abandoned the restriction in question. It is universally recognized that a restrictive covenant may be relinquished, waived or abandoned, or the right to enforce it may be lost by estoppel, 26 C.J.S. Deeds § 169; 14 Am.Jur. Covenants, Conditions and Restrictions, § 295; Joyce on Injunctions, Vol. I, § 488;

High on Injunctions, Vol. II, Fourth Ed., § 1159; consult also Compton Hill Improvement Co. v. Strauch, 162 Mo.App. 76, 84, 85, 141 S.W. 1159; Pierce v. St. Louis Union Trust Co., 311 Mo. 262, 278 S.W. 398; Britton v. School District of University City, 328 Mo. 1185, 44 S.W.2d 33. Whether there has been such acquiescence to constitute relinquishment, waiver or abandonment of restrictions depends upon the circumstances of each case, 26 C.J.S. Deeds § 169; 14 Am.Jur. Covenants, Conditions and Restrictions, § 295.

■ The record in this case simply does not establish that the restriction was waived, relinquished or abandoned. It is true, as emphasized by defendants, that on May 15, 1956, twenty-nine violations existed, for on that day this letter was sent "To All St. Louis Hills Estates No. 2 Home Owners:

"We believe St. Louis Hills Estates No. 2 is the finest subdivision in St. Louis, and as your trustees we would like to do our best to maintain the beauty and the values of our home-sites and our neighborhood.

"There have been some violations of the restrictions and in one flagrant instance, we have filed a suit in the Circuit Court to enforce the restrictions against backyard fences. We have also notified some 29 of the residents of our area who have fences violating these restrictions, and have requested that they co-operate by removing said fences."

However, in the absence of evidence showing when, and the circumstances, if any, under which the fences were erected, the fact that 29 violations existed in May, 1956, nearly a year after the suit was filed, is wholly insufficient in and of itself to justify a finding that the trustees had manifested an intention to waive, relinquish or abandon the restriction. None of the 29 lot owners referred to in the letter testified, and the only proof as to

when the alleged violations occurred came from Mr. Cammann, who stated he had been a trustee for three years prior to January 7, 1957, (date of trial) and that the fences were in existence when he assumed office.

Overlooking, however, for the purpose of this opinion, the meager showing as to the duration of the other violations, and assuming, without deciding, that prior to the instant violation, 29 prohibited fences had been constructed in the subdivision, the evidence affords no proof that there was an abandonment, waiver or relinquishment of the restriction. Indeed, the evidence demonstrates the trustees were endeavoring to prevail on all lot owners to conform to the restriction. Not only does the letter disclose that the attitude and position of the present trustees is inconsistent with an intention on their part to waive or abandon the restriction, but their testimony given in the trial also reveals an effort by them to cause lot owners to adhere strictly thereto. Trustees Eichelsbach and Kennedy testified that through efforts on their part the owner of one of the lots had removed a fence which had been erected in violation of the restriction; Eichelsbach stated further that the trustees had turned down requests by others for permission to build fences, and that the trustees had been consulting with their lawyer concerning the advisability of instituting other suits against those who had failed to conform; Mr. Cammann stated that it was his intention, as one of the trustees, subject to the successful conclusion of this action, to compel all property owners in the subdivision to fully comply with all restrictions.

■ For another reason we have the opinion that there was no waiver, abandonment or relinquishment of the restriction. Receiving universal recognition is the principle that where, as here, the restrictions apply to an entire subdivision, and are part of an over-all scheme designed for the benefit of all property owners in the restricted area, violations of the restrictions must be so general as to indicate an intention or purpose on the part of those residing in the subdivision to abandon the plan or scheme intended to be maintained by force of the restrictions. Ward v. Prospect Manor Corp., 188 Wis. 534, 206 N.W. 856, 46 A.L.R. 364; Hemphill v. Cayce, Tex.Civ.App., 197 S.W.2d 137; Braswell v. Woods, Tex.Civ.App., 199 S.W.2d 253, 255; German v. Chapman (Eng.) 7 Ch.D. 271 (1877) followed in Knight v. Simmonds, (Eng.) 2 Ch.Law Reports 294 (1894); 43 C.J.S. Injunctions § 87, pp. 593, 594; Annotation, 46 A.L.R. pp. 372–380; Thompson on Real Prop. Vol. 7, § 3650; consult also Pierce v. St. Louis Union Trust Co., 311 Mo. 262, 278 S.W. 398(8); Thompson v. Langan, 172 Mo.App. 64, 86, 87, 88, 154 S.W. 808. The sufferance of violations on 29 of the 160 lots in the subdivision, does not conclusively establish or demonstrate an intention on the part of the trustees or the other lot owners to abandon the plan or scheme designed for the benefit of the whole subdivision and for the purpose of maintaining it as a first-class residential area.

■ The point is also made that because the trustees did not institute court proceedings promptly after defendants threatened in April, 1955, to construct a fence upon their property, and because there was a delay of seven days from the time the fence posts were placed until the suit was actually filed, the trustees were guilty of laches and are now estopped from thrusting upon defendants the loss incident to removal of the fence. We find no merit in this contention. On the bare statement by Mr. Harding in April, 1955, that he was going to build a fence, without designating the type contemplated, the trustees were hardly justified in taking legal action. As we have seen, ornamental fences are permitted on written consent of the trustees. So it would appear that fol-

687

lowing the conversation between Mr. Harding and trustee Eichelsbach in which the latter stated, "I can't stop you but there's restrictions," the trustees were justified in assuming that defendant would act in a provident manner, and at least make an effort to conform to the restriction. Neither are we able to agree that a lapse of seven days between the time the construction of the fence began and the date that the suit was filed constituted an unreasonable delay. The trustees took concerted action on the same day the fence posts appeared by deciding to employ a lawyer. This was accomplished within a day or two. Having in mind the preliminary work that was entailed in preparation of the suit papers, such as legal research and title examination; the drafting of a comprehensive and lengthy petition; securing of injunction bond; and preparation of required orders and obtaining certified copies thereof for service, there can be no escape from the conclusion that able and industrious counsel acted with diligence and celerity in an effort to secure the restraining order before the fence was completed. Our views are supported by persuasive and sound authority. Palfrey v. Killian, 224 Mo.App. 325, 27 S.W.2d 462, 463–464; Ridley v. Haiman, 164 Tenn. 239, 47 S.W. 2d 750; Douglas v. Queeney, 109 Pa.Super. 336, 167 A. 453; Tolsma v. James E. Scripps Corp., 153 Mich. 14, 116 N.W. 622; Annotation, 12 A.L.R.2d 396, et seq. Moreover, defendants pursued the fence project over the protest and warning of the representative of the trustees and with full knowlelge that they were violating the restriction. It is therefore appropriate, in rejecting the plea that a hardship will result if defendants are required to remove the fence, to remind them that their plight is of their own making.

Neither do we find merit in defendants' final contention that plaintiffs have an adequate remedy at law and that injunction will not lie. What we have heretofore said in connection with the right of plaintiffs to the relief granted by the trial court,

should suffice to dispose of this contention. The judgment of the trial court, being correct, is in all respects affirmed.

ANDERSON, J., and JAMES D. CLEMENS, Special Judge, concur.