George Ph. EICHELSBACH, F. A. Cammann and Earle J. Kennedy, Trustees of "St. Louis Hills Estates No. 2 by Cyrus Crane Willmore" Subdivision, Plaintiffs-Appellants,

v.

Charles E. HARDING and Edna J. Harding, his wife, Defendants-Respondents.

STATE of Missouri ex rel. George Ph. EICHELSBACH, F. A. Cammann and Earle J. Kennedy, Trustees of "St. Louis Hills Estates No. 2 by Cyrus Crane Willmore" Subdivision, Relators,

v.

Hon. James F. NANGLE, Judge, Div. No. 3, St. Louis Circuit Court, Respondent.

Nos. 30491, 30209.

St. Louis Court of Appeals.

Missouri.

Sept. 20, 1960.

Carl A. Enger, St. Louis, for appellants.

Tralles, Hoffmeister & Gilpin, Fred J. Hoffmeister, Carroll C. Gilpin, St. Louis, for respondents.

BRADY, Commissioner.

The parties have been engaged in extensive litigation over the erection of a fence for some time now, and a brief résumé of the factual background is necessary for a complete understanding of the issues involved. By duly recorded plat, a tract of land in the southwest part of the City of St. Louis was subdivided into 160 lots, and designated as "St. Louis Hills Estates No. 2." The subdivider entered into an original indenture agreement with the three original trustees establishing certain restrictions, covenants, reservations and conditions for the subdivision. Among other things, the indenture provided for the election of successor trustees, and empowered the trustees on behalf of, and for the benefit of, the owners of lots in the subdivision to prosecute any proceeding against persons violating the restrictions. Among these restrictions is the one about fences, which reads:

"No fence (except such ornamental fences as may be approved in writing by the Trustees) shall be erected along the sides or rear line of any lot; * * *".

By other provision of this indenture, this restriction binds the respondents as if fully set out in the deed to the lot they purchased. The respondents began construction of a house on their lot in the subdivision and the plans were submitted to the trustees for their approval. These plans did not disclose that there was to be a fence on the premises. Respondents never made application for or received written permission or approval of the trustees to erect the fence prior to its erection. When the fence was discovered, counsel was employed by the trustees, and a petition for an injunction was filed. Because of the delay in filing bond, issuing the order to show cause and the certified copies of the restraining order, service was not obtained until after the fence was completed. The fence is of the type known as "cyclone" or "chainlink." Upon trial, the trial court perma-nently restrained and enjoined the respondents from maintaining the fence, mandatorily ordered them to remove it, and permanently enjoined them from erecting any fence along the sides or rear line of their property without the written approval of the trustees. This decision of the trial court was appealed, and in Eichelsbach v. Harding, Mo.App., 309 S.W.2d 681, this court affirmed that decision. Our decision was handed down February 4, 1958, and the mandate and opinion was received by, and filed in, the trial court on April 1, 1958. On June 10 of that year, the appellants filed their verified motion for citation for contempt of the respondents, alleging non-compliance with the affirmed mandatory order and injunction. After issuance of the order to show cause and service thereof, the respondents filed their return. In that return, the respondents allege the election of successor trustees and as a defense to the order to show cause state that the indenture also provides for modification and/or removal of the restriction by instrument duly signed, acknowledged and recorded by " * * * The record owners of the fee simple title of at least seventy-five percent (75%) of all lots in the subdivision * * * "; that a petition was then being circulated to determine if "seventy-five percent (75%) of said property owners" are in favor of changing the fence restriction to read as follows:

" * * * 'All Ornamental or Chain Link wire fences heretofore installed are approved; all fences hereafter to be installed must first be approved in writing by the Trustees.' "

The return prayed the court to withhold action until the action relative to this amendment had been determined, "and respondents reassure the Court that if said amendment is defeated and they are advised by the present Trustees to remove their fence, they will fully comply with such order and that it will not be necessary to apply to this Court for any further judgment or action in the matter." On June 18th, when this return was filed by

leave, the matter was passed until July 1, 1958. On this latter date, the substitution of the successor trustees was ordered, and the cause continued until July 22, 1958. The mandate of this court had then been in full effect for some 113 days. On July 22, 1958, the respondents filed their substituted Exhibit One (1) which was the minutes of the meeting of the trustees of July 21, 1958. That exhibit showed that "114 of the 155 home owners, which represents approximately 74% and/or two short of being 75% of the home owners" had signed for the change of the restriction as to fences. That exhibit reads, in part, as follows:

" * * * After a discussion of the entire matter it was stated by Chairman H. F. Voertman, that to the best of his knowledge, as a Trustee during the years of 1950, 51 and 52, Mr. Cyrus Crane Willmore and Mr. Higgenbotham, had prior to his tenure of office, verbally approved various and sundry fences in the area, and that said information was conveyed by the former Trustees to Messrs. Cammann, Eichelsbach and Kennedy in writing, and also that other chain link fences had been previously erected during the tenure of office of Messrs. Cammann, Eichelsbach and Kennedy and that no action had been taken by said Trustees, nor did they question them.

"Therefore, We, the undersigned, being the duly elected and acting Board of Trustees of St. Louis Hills Estates No. 2, do hereby approve all of the fences heretofore erected which includes that of Mr. Charles A. Harding, provided however, that he agrees to move his present fence on the East line of his property to the rear of the house, and further agrees to plant sufficient shrubs on the Donovan Avenue side of said property so as to obscure the fence from view as much as is reasonably possible. He is there-

fore granted a period of 90 days in which to comply."

/s/ "H. F. Voertman, Chairman"

/s/ "D. A. Martin, Secretary"

/s/ "Frank C. Olds, Treasurer."

On that same day, the trial court entered its order as follows:

"Substituted Plaintiffs' Exhibit One filed.

"Now at this day come the parties hereto by their respective attorneys and the hearing on movants' Motion For Citation for Contempt, heretofore filed herein is submitted to the court upon the pleadings and proof adduced, and the court having heard and duly considered the same and not now being sufficiently advised thereof, doth order that said defendants be granted 90 days additional time from this date in which to purge themselves of contempt of court by complying with Exhibit One (1) this day filed herein." (See Exhibit One above.)

It is obvious that the trial court ordered compliance with Exhibit One upon the approval of less than 75% of the record owners of the fee simple title of all lots in the subdivision.

We now pass to the petition for a writ of mandamus which was filed in this case by appellants on August 4, 1958. The petition for that writ, which was an original proceeding in this court, alleges that the trial court's order of July 22, 1958, set out above, was in error, contrary to, and in direct conflict with our mandate of April 1, 1958. The petition prayed for a writ commanding the trial court to enforce the April 1st mandate of this court, and further prayed that the trial court's order of July 22nd " * * * be expunged from the record and for naught held, * * *." Following our usual procedure, we granted time to file an appropriate pleading to the respondent's answer in return to the alternative writ, and on October 16, 1958,

the respondent filed in this court his motion to quash and dismiss the alternative writ of mandamus. The motion alleged that the issue raised by the writ of mandamus had become moot, and for grounds therefor stated:

"* * * That Herbert F. Voertman, Chairman of the Board of Trustees of St. Louis Hills Estates No. 2, has submitted his affidavit herewith, together with certain documentary evidence showing that at least seventy-five percent (75%) of all lots in the Subdivision entitled to vote have, in accordance with the provisions of the original Indenture, which defines the restrictions pertaining to the Subdivision, and particularly the restriction prohibiting certain fences, decided to modify and amend the restriction pertaining to fences to the effect that all ornamental or chain-link wire fences heretofore installed are approved; all fences hereafter to be installed must first be approved in writing by the Trustees."

The affidavit referred to in the above quoted portion of the motion to quash and dismiss the alternative writ recited Clause F of the Trust Indenture, which provides for modification or removal of any of the restrictions in the trust indenture by instrument duly signed, acknowledged and recorded, by at least 75% of the record owners of the fee simple title of all lots in the subdivision. It further states that in accordance with the provisions and procedure of that clause, the record owners of at least 75% of the lots in the subdivision entitled to vote have voted to modify and amend Clause E of the indenture by eliminating therefrom the restrictions as to fences as contained in the original trust indenture and inserting in lieu thereof the words: "All Ornamental or Chain Link wire fences heretofore installed are approved; all fences hereafter to be installed must first be approved in writing by the Trustees." The affidavit further recited that there were 166 lots entitled to vote in the subdivision and that the votes in favor of the amendment were 126.05, and submitted a copy of the supplemental indenture amending the restrictive clause as to fences of the original indenture, stating that it "* * * is an exact copy of that executed by the lot owners. * * *" This affidavit was made by Mr. Herbert F. Voertman, and his acknowledgment reads as follows:

"Herbert F. Voertman, being duly sworn on his oath says that the facts set forth in the above affidavit are true.

"/s/ Herbert F. Voertman"

The appellants then filed their motion to dismiss the respondent's motion to quash and dismiss the alternative writ, and stated therein that in direct contradiction of the respondent's motion to quash and dismiss the alternative writ, no documentary evidence of any kind had been filed for record showing that at least 75% of all the lots in the subdivision entitled to vote had amended the original indenture pertaining to the restrictions prohibiting fences; that there had been no adoption of any kind of any such amendment; and that the record owners of the fee simple title of at least 75% of all the lots in the subdivision have never duly signed, acknowledged and recorded any instrument in the office of the Recorder of Deeds of the City of St. Louis modifying or removing any of the restrictions. The relators' motion to dismiss that motion to quash stated:

"* * * 3. That no signatures have been filed of record in the instant case, of any record owners of at least seventy-five percent (75%) of the lots in the subdivision entitled to vote, who alledgedly (sic) have decided to modify and amend Clause E of the Indenture, as sworn to in paragraph 4, page 1 of the Affidavit of Herbert F. Voertman.

*    *    *    *    *    *

"5. That no plat of the subdivision St. Louis Hills Estates No. 2 has been filed of record in the instant case, as sworn to in paragraph 3, page 2 of the Affidavit of Herbert F. Voertman.

"6. That no signatures have been filed of record in the instant case of 'the undersigned, constituting seventy-five percent (75%) or more of the Record Owners of the Fee Simple Title of all the lots in the subdivision in the City of St. Louis, Missouri, known as "St. Louis Hills Estates No. 2 by Cyrus Crane Willmore", as set out in paragraph 7 of the 'Supplemental Indenture, Amending Certain General Restrictions in Clause E of Original Indenture', which is appended to the affidavit of Herbert F. Voertman.

"7. That the affidavit of Herbert F. Voertman, marked 'Copy' that was mailed to Counsel for Relators by Attorneys for Respondent is not a carbon copy of the affidavit that appears of record in the instant case."

On October 30, 1958, we overruled respondent's motion to quash our alternative writ of mandamus for the reason that " * * * said motion does not allege that the record owners of at least 75% of all lots in the subdivision have by instrument duly signed and recorded by them modified the restrictions."

Proceeding further with the mandamus action, on November 25, 1958 the respondent tried again, and filed another motion to quash the alternative writ of mandamus. This motion was accompanied by suggestions which included a copy of the original indenture and was also accompanied by a copy of the minutes of the meeting of the board of trustees for the subdivision of November 22, 1958. Those minutes provided:

"Herbert F. Voertman, Chairman the Board of Trustees of St. Louis Hills Estates No. 2, the other Trustees being D. A. Martin and Frank C. Olds, states that on the 22 day of November, 1958, a meeting of the Trustees was held; that the question of the approval of the fence of Charles E. Harding and Edna J. Harding on their premises at number 6490 Kinsey Place was duly considered by the Trustees. They found that the Hardings had complied with their requests of July 22, 1958 by moving their fence from the east line of their property to the rear of their house and that they had planted sufficient shrubs on the Donovan Avenue side of their property so as to obscure the fence as much as possible.

"Therefore, acting in accordance with the provisions of the Indenture and the discretion granted to them, thereunder and particularly clause E-2 of said Indenture, the said Trustees did find that of the home owners owning lots more than 75% have no objection to said fence and did unanimously approve in writing the fence of the said Charles E. Harding and Edna J. Harding, his wife in its present condition.

"The action of the Board of Trustees is subject to the approval of their Attorney of Record Mr. Oliver F. Erbs."

/s/ "Herbert F. Voertman
Herbert F. Voertman,
Chairman
Board of Trustees
St. Louis Hills Estates
No. 2"

"Approved" /s/ "Oliver F. Erbs
Oliver F. Erbs,
Attorney."

In accordance therewith, the trustees formally approved in writing the fence in question. That approval was as follows:

*"Approval of Fence of Charles E. Harding and His Wife, Edna J. Harding at 6490 Kinsey Place*

"The Trustees of St. Louis Hills Estates No. 2 in accordance with the action taken at their meeting duly held on November 22, 1958, do hereby approve the fence which has been erected by Charles E. Harding and Edna J. Harding, his wife on their premises at number 6490 Kinsey Place. This action is taken by the Trustees under the authority and power and in the exercise of their sound discretion in accordance with the provisions of the Indenture governing the restrictions as to St. Louis Hills Estates No. 2.

"Trustees of St. Louis Hills Estates
    Number 2
    "By" /s/ "Herbert F. Voertman
            Herbert F. Voertman,
                Chairman."

It is obvious from a reading of the suggestions and the motion of November 25, 1958 that the Hardings by that action abandoned their previous position that the modification of the prohibition against fences found in the original trust indenture had been approved by 75% of those of whom the trust indenture required approval. The theory then advanced was that since clause C-13 of the trust indenture provided: "And it shall be the duty of the Trustees, when in their discretion it may seem necessary and proper, to avail themselves of and exercise the rights and powers herein granted to them * * *"; and clause G of the trust indenture provided: "* * * It is the intention of this indenture that the government of said subdivision as herein contemplated shall eventually be in the hands of Trustees * * *"; the trustees had power and authority under the indenture to approve the Harding fence. This argument, of course, means that they had power and authority to declare the Harding fence an ornamental fence. On December 23, 1958 we overruled the respondent's motion of November 25th to quash the alternative writ of mandamus, and we set the case for hearing on April 10, 1959, and required briefs from the parties to be served and filed in

accordance with Supreme Court Rule 1.09, 42 V.A.M.S.; relators were to deliver the first brief. On March 2, 1959, the respondent filed a motion to modify the order of September 16, 1958, wherein it was alleged that the Hardings had filed a motion to modify the injunction in the trial court, and that the motion was now pending in the trial court but that the trial court would not proceed to hear it (and quite properly so) without permission from this court, because of the pendency of the mandamus proceeding. On March 9, 1959, the appellants filed their motion to strike respondent's motion to modify our order of September 16, 1958. It will be recalled that the order of September 16, 1958 was the issuance of the alternative writ. On March 13, 1959 we sustained that motion. At that time we directed the Clerk to send a letter to the trial judge, informing him of our action, with copies furnished to counsel. The effect of our order of March 13, 1959 became a source of dispute in the trial court, and for that reason, and because it states exactly what our order of March 13th was, the letter is set out in full as follows:

"Dear Sir:
    "The Court has today made the following orders in the above entitled cause:
    "Repondent's motion to modify order of this Court of September 16, 1958, sustained and our order modified so that nothing contained therein shall restrain the respondent judge of Division 3 of the Circuit Court, or his successor, from hearing and passing upon a motion to modify the injunction, now pending in said division.
    "Relators' motion to strike respondent's motion to modify order of St. Louis Court of Appeals of September 16, 1958, overruled.
                "Yours truly,
                /s/ Bertha E. Cox
                Clerk St. Louis Court of
"BEC:lh        Appeals."

By our order the mandamus action was heard and submitted on June 6, 1960 at the

same time as the appeal from the trial court's order modifying the injunction and mandatory order.

We now return to the appeal before us as distinguished from the mandamus action. The respondents' motion to modify the original injunction and mandatory order was filed with the trial court on January 9, 1959, and recited the action of the trustees on July 21, 1958, previously set out herein. The motion further set out:

"* * * That the said Trustees, at a meeting duly held by them on November 22, 1958, did approve the defendants' fence after the changes had been made as heretofore stated, which action of the Trustees was taken by them under the authority and power and in the exercise of their sound discretion in accordance with the provisions of the indenture governing the restrictions as to St. Louis Hills Estates No. 2.

"4. That the changes which the defendants have made in their fence comply with the provisions of the indenture governing the restrictions therein in that the defendants' fence is now regarded by said Trustees, in their opinion and in the exercise of their sound discretion, to be an ornamental fence within the meaning of the restrictions and particularly Clause E, paragraph 2.

"Wherefore, by reason of the changes which have been made as to defendants' fence since the injunction was originally granted in this Cause, and for the reasons hereinabove stated, defendants pray that this Court, by order and decree, modify said injunction so as to permit the defendants' fence to remain in its present condition."

Appellants filed their counter motion to strike the respondents' motion to modify the injunction, and on September 25, 1959, these motions came on for hearing. At that time there was also pending before the trial

court the motion to cite for contempt which had not been finally disposed of.

At the beginning of this hearing there was a discussion between the court and both counsel over the meaning of that portion of this court's letter of March 13, 1959, stating that relators' motion to strike respondent's motion to modify the order of this court of September 16, 1958, was overruled. The trial court adopted the position of the respondent and held that the last paragraph of that letter overruled the appellants' motion to strike pending in the trial court and so refused to permit appellants' counsel to argue his motion to strike the respondents' motion to modify. The trial court then entered its order discharging the respondents from contempt, stating that they had purged themselves. That order reads:

"Citation for contempt having heretofore been heard and taken as submitted and defts' Harding alleged contemnors, having purged themselves, said defts Harding are discharged."

The respondents then proceeded upon their motion to modify the injunction. The witness Voertman, one of the trustees, testified that the respondents had shrubs planted and had the section of the fence that extended up to the front of the house on the east side moved to the rear building line; that they had done all the trustees had requested them to do in the minutes of the July 21st meeting; that the shrubbery is planted and vines are growing on the fence, covering practically all of it, and that at the meeting of the trustees on November 22, 1958, they approved, in writing, the fence in question. On cross-examination, Voertman testified that this meeting was called by him by telephone calls to the other two trustees, and was called while they were in the process of trying to obtain signatures to this modification of the indenture; that the meeting was not open to the public, and that he did not anticipate anyone else being at the meeting except anyone who was out working on the modi-

fication petitions; that the action the trustees took with respect to the fence was reported to the other lot owners by mail some six months later, on February 20, 1959; that they never had the approval of 75% of the lot owners. Voertman further testified on cross-examination that he did not know whether or not this court ever said in its opinion that this fence was utilitarian, not ornamental; that in his opinion the fence is a dual purpose fence; that the only portion of the fence moved was that at the east side of the front of the house; that the reason the trustees approved this fence was that other fences of the same type had been erected in the neighborhood and that when he was trustee previously, in 1950, he had been appointed by the subdivider who had approved many of those same fences, and the subdivider had told him he considered a chain-link fence ornamental; that the minutes of the trustees' meeting of July 21, 1958 had never been written up and circulated among the lot owners and residents of the subdivision; that he planted flowers but was not a botanist nor a horticulturist, and had no training along those lines but was familiar with evergreens although he was not with vines; that he knew a morning-glory to be a vine but that was all he knew of them; that while he was familiar with rooster comb, he didn't know whether it was an annual or a perennial; that the difference between an annual and a perennial was that annuals die each year; that he didn't know whether the type of foliage he saw on the respondents' fence would die from cold weather or not.

The respondents' son testified that he took some pictures on September 4, 1959 of the fence on the west side of his parents' property and the fence had been in the condition shown by the photographs since the latter part of June of that year. On cross-examination he testified that he was a free lance writer and knew nothing about flowers other than that you had to sprinkle them. The respondents then offered the photographs as exhibits and they were ad-

mitted, whereupon respondents rested their case.

The appellants then requested leave to proceed with evidence in "* * * support of our position that the motion here to modify should not be granted * * *." The court refused to allow them to do so on the ground that the trustees' order was discretionary and the court considered it binding upon it. Appellants then made an offer of proof. This offer consisted of the offered testimony of a professional horticulturist, florist and gardener that he made a personal inspection of the premises involved on September 25, 1958; that the foliage consisted of celosia, commonly known as rooster comb, and morning-glory vines, that these are annuals and would die upon frost or cold weather, and that when they die, they wither and turn brown and would soon blow away, leaving the fence denuded; that the fence is strictly a utilitarian fence; that his opinion as to the foliage was based on some 40 years of experience. Appellant further offered the testimony of Earle Kennedy, a former trustee, to the effect that he passes the fence in question daily; that he was an engineer and familiar with metals and wire fences, and that this fence is the type known in the trade as a utilitarian fence of the type used to enclose a barnyard or cow pastures and not offered to the public for sale as an ornamental fence; that the fence had remained devoid of any growing vines or foliage since its erection in June of 1955; that the morning-glories and rooster comb had all been planted within the preceding 30 days, that a notice was duly sent to the respondents advising them of the decision of this court in the previous appeal and ordering them to take the fence down; that there was some $4,000 raised by assessment in this subdivision to compel removal of the fence, which has been expended. Counsel for the appellants then desired to continue with his offer of proof, but the court sustained an objection to it that it was not "admissible or competent or relevant under the circumstances" and

refused to allow him to do so. Counsel for appellant further attempted to offer appellants' exhibits 1 through 8, photographs "depicting the condition of the Harding fence", and the court sustained an objection to them. Appellants' counsel then offered the evidence of some other witnesses who he stated would testify to the same effect as Mr. Kennedy, and offered the official recording of the indenture, and the opinion of this court in the former case. Respondents' counsel then offered specifically clauses C–13 and G of the indenture agreement, and the matter was taken as submitted.

Three days later, on September 28, 1959, the trial court entered its order sustaining the motion to modify the injunction, "and does hereby adjudge, order and decree that said injunction be modified permitting defendants' fence to remain in its present condition." Appellants then filed after trial motions as to both the order discharging and purging the respondents from contempt, and the order modifying the original injunction and mandatory order. These were overruled, and these appeals are the result.

It is clear from the wording of respondents' motion to modify the original injunction and mandatory order, which is the subject of this appeal, and also from the wording of the November 25th motion to quash and dismiss the alternative writ filed by respondents in this court in the mandamus action, that the respondents have abandoned any theory of modification or change of the restriction as to fences by the required number of owners of fee simple title of lots of the subdivision, and have restricted themselves to the theory that this was an ornamental fence. Respondents argue that the trustees had the discretion to state whether or not this fence was an ornamental fence, and that having such discretion, their discretion cannot be interfered with by mandamus. This same argument also goes to the respondents' position in the case upon appeal as distinguished from the mandamus action. Respondent argues that this was an ornamental fence, so declared to be by the trustees, and therefore, the written permission of the trustees was conclusive, they having the governmental authority of the subdivision.

The appellants' position is that this fence is not an ornamental fence, and could not so become by planting placed around it, and therefore the trustees had no authority to approve it. On the question of the mandamus action and the citation for contempt, the appellant argues that the order approved by this court in the previous appeal was never complied with, and that his evidence, if he had been allowed to put it on, would have not only shown the lack of an ornamental fence but would have shown that the respondents never attempted to comply with the injunction and mandatory order, and in fact only began the planting some thirty days before the hearing.

■ This court's letter of March 13, 1959 did overrule appellants' motion to strike respondents' motion to modify our order of September 16, 1958, which motion to strike was filed in the mandamus action then pending before us, but we could not and did not overrule the appellants' motion to strike respondents' then pending motion in the trial court to modify the injunction and mandatory order previously issued by the trial court. We can only rule upon matters pending before us. The motion to strike the respondents' motion to modify the injunction was never before us. That motion to strike referred clearly to the respondents' motion to modify the mandatory injunction issued by the trial court on March 12, 1957. It so states. The motion we overruled clearly referred to the appellants' motion to modify our order of September 16, 1958, issuing our preliminary writ. It so states. The dates are different, the matters sought to be struck are different, they were filed in different courts, everything about the two motions patently indicates their difference to all who will take the time to read them. Since the trial

court stated that it was not going to allow evidence on the appellants' motion to strike and considered said motion as overruled by this court, stating, "I can't hear you under this directive. I might be cited for contempt * * *", it is obvious that, in effect, appellants have never had a ruling on the merits of their motion to strike the respondents' motion to modify the injunction and mandatory order previously issued.

It is equally clear that since the court refused to permit the appellant to present evidence on the motion to modify the injunction and mandatory order, the appellants have, in effect, never been heard or had their evidence considered as to whether or not this injunction should be modified. The trial court took the position that under the trust indenture the trustees had the discretion to declare whether or not the fence was "ornamental" and thus subject to their written approval, or "utilitarian", or such as to otherwise fall within those absolutely prohibited by the trust indenture. Since the trustees had declared the fence to be ornamental in the exercise of their power and had approved it in writing, no evidence offered by the appellants could be pertinent. This position is inconsistent with the trial court's authority as stated by the respondents themselves. Respondents cite 28 American Jurisprudence, § 316, pp. 830–831, stating:

> "With regard to the causes or occasions which may call for the modification or suspension of a permanent injunction, the rule seems to be that the court, in its discretion, may always permit or order such modification or suspension where it believes the ends of justice will be thereby served. Where the grounds and reasons for which the injunction was granted no longer exist, by reason of changed conditions, it may be necessary to alter the decree to adapt it to such changed conditions, or to set it aside altogether, as where there is a change in the controlling facts on which the injunction rests, or where the applicable law, common or statutory, has in the meantime been changed, modified, or extended. Such change in the law does not deprive the complainant of any vested right in the injunction because no such vested right exists. On application to modify the decree, the inquiry is simply whether changes since its rendition are of sufficient importance to warrant such modification. However, the injunction, whether right or wrong, cannot on such a hearing be impeached in its application to the conditions that existed at its making."

It is obvious that since the court issued the original decree, the decision as to whether or not changes should be made in it is one for the court to make, and is not a decision to be thrust upon the court by the action of another. It is a decision of the court, and not a rubber stamp approval of an act of the trustees, that is required before modification of the original injunction and mandatory order can be made. Since the court's decision is required, it must be made in the exercise of its wise discretion and this entails the consideration of the evidence presented by both sides of this controversy. The trial court refused to hear but one part of the evidence upon which it should have based its discretion and, in fact, did not even rely upon the evidence it did hear, for it considered the action of the trustees in declaring the fence to be ornamental binding upon it.

■ Normally these errors, which are patently of the nature that require reversal, would dispose of this matter so far as we were concerned, and we would remand the case. However, in view of the history of this litigation we feel bound to pass upon the issues presented and render our judgment. This we can do, for in our view of the situation here presented, all the evidence required is before us now. Such action on our part is authorized by Section 512.160, RSMo 1949, V.A.M.S. authorizing this court, except in instances with which we are not here concerned, to "* * * give such judgment as such court

ought to have given, as to the appellate court shall seem agreeable to law. * * *" We are also urged therein to finally dispose of the case upon appeal unless justice requires otherwise. Accordingly, we will herein pass upon the issue presented to the trial court and fundamental to this case; that question is whether or not the fence in this case, a "cyclone" or "chain-link" type which we earlier held to be strictly a "utilitarian", not "ornamental" fence, can be said to have been, at the time the modification was urged and granted, an "ornamental fence."

■ It is obvious that the fence has not changed. It is the same fence we earlier held to be "utilitarian" and it is equally obvious that moving a part of the fence from the east front of the house to the east rear of the house did nothing to change its character from "strictly utilitarian" to "ornamental." By that latter statement, we are not to be taken as holding that the placement of a fence cannot, under certain circumstances, affect its character as ornamental or utilitarian, but under these facts such a change in position clearly did not do so.

All that remains, then, is to decide whether or not the plantings testified to in the evidence change the fence. We do not think they can. Neither do we think it necessary to submit this issue to trial for a consideration of appellants' offered evidence. Regardless of whether these plantings were perennials or annuals, or what their name was, the fence remains the same. The plantings may ornament the fence but it is the fence we are concerned with, and even in that state the fence is still utilitarian even as we previously declared it to be. An "ornament", we are told by Webster's New International Dictionary, 2d Edition, is

"That which is added to embellish or adorn; that which adds grace and beauty; * * * Addition or inclusion of anything that beautifies; * *."

This fence does not come within that definition.

Insofar as the action of the trial court in overruling appellants' motion to strike respondents' motion to modify is concerned, that action is reversed, and the appellants' motion to strike respondents' motion to modify is sustained. Insofar as the action of the trial court in sustaining the respondents' motion to modify is concerned, that action is reversed. Insofar as the trial court's order modifying the original injunction and mandatory order it entered in these proceedings is concerned, that order is reversed and the original injunction and mandatory order reinstated. Costs of these proceedings are to be assessed against the respondents. Insofar as the mandamus action is concerned, our preliminary writ is now made absolute, and the trial court ordered to immediately and forthwith compel the compliance of the respondents with the original injunction and mandatory order offered by this court in its mandate of April 1, 1958. Insofar as the citation for contempt is concerned, that citation is ordered reinstated and the trial court is directed to enter an order holding the respondents in contempt and providing therein adequate penalties to enforce the mandatory injunction originally issued and thereafter affirmed by this court. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. Therefore, appellants' motion to strike respondents' motion to modify is sustained. The original injunction and mandatory order are reinstated. In the mandamus action, our preliminary writ is now made absolute. The citation for contempt is ordered reinstated and the trial court is directed to enter an order holding the respondents in contempt and providing therein adequate penalties.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.